FILED

2008 FEB 15  AM 7: 05

RICHARD W. WIEKING
CLERK
U.S. DISTRICT COURT
NO. DIST OF CA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PAI CORPORATION,

      Plaintiff,

v.

INTEGRATED SCIENCE SOLUTIONS,
INC., ET AL.,

      Defendants.

_____/

No. C-06-05349 JCS

**ORDER RE SUMMARY JUDGMENT
MOTIONS [Docket Nos. 55, 57 (redacted),
96 (sealed)]**

## I.   INTRODUCTION

Plaintiff, PAI Corporation ("PAI"), filed this action on August 30, 2006, asserting that Defendant Cecelia McCloy and the company she headed, Integrated Science Solutions, Inc. ("ISSi"), took advantage of ISSi's position as subcontractor with PAI to "usurp[] PAI's role as prime contractor [and] take over the consulting contract" PAI had been awarded with the National Aeronautics and Space Administration/Ames Research Center ("NASA ARC"). On January 5, 2007, Defendants filed an Answer to the Complaint and asserted counterclaims for breach of contract, libel, and slander. The parties now bring motions for summary judgment (hereinafter, "Plaintiff's Motion" and "Defendants' Motion") seeking judgment in their favor with respect to various claims asserted by Plaintiff. A hearing on the Motions was held on Friday, February 1, 2008, at 9:30 a.m. For the reasons stated below, Plaintiff's Motion is GRANTED IN PART and DENIED IN PART. Defendants' Motion is GRANTED IN PART and DENIED IN PART.[1]

_____

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).

## II. BACKGROUND

### A. Facts

#### 1. The Parties

PAI is a Tennessee corporation that was founded in 1983 by Doan Phung, an expert in nuclear engineering and environmental sciences. Complaint at 1, 3. PAI generates most of its revenues by bidding for governmental safety and environmental services projects from various government agencies, including NASA. *Id.*

ISSi is a California corporation that was founded by Cecelia McCloy, a citizen of California, in March 1999. Complaint at 4. At that time, McCloy was president of ISSi and her husband, David Dobson (also a citizen of California), was vice-president. *Id.* Previously, McCloy had been vice-president of a large company that was in the same field as PAI, Science Application International Corporation ("SAIC"). Complaint at 3-4. McCloy left SAIC in early 1999. Complaint at 4.

#### 2. The OSIHMES Contract

In late 1998, NASA ARC issued a request for proposal ("RFP") to provide technical site services for occupational safety, industrial hygiene, environmental and medical services under contract (the "OSIHMES Contract"). *Id.* At the time NASA ARC issued the RFP for the OSIHMES contract, SAIC was the incumbent contractor providing these services and McCloy was the on-site program manager. *Id.* NASA ARC decided to "recompete" the contract in 1999 as a set-aside for small business. *Id.* at 4-5. Because SAIC was a large company, it was not eligible to compete. *Id.* at 5.

In early 1999, PAI and ISSi signed a teaming agreement (the "Teaming Agreement"), effective May 10, 1999, to work together to compete for the OSIHMES Contract, with PAI as prime contractor and ISSi as a subcontractor. Joint Statement of Undisputed Facts (Joint Statement), ¶ 1; *see also* Declaration of Patricia A. Meagher in Support of Defendants' Motion for Partial Summary Judgment ("Meagher Motion Decl."), Ex. 4 (Teaming Agreement). The Teaming Agreement contained a choice-of-law provision specifying that Tennessee law would govern the agreement. Meagher Decl., Ex. 4, Art. 16. It specified that Cecelia McCloy would be designated as program manager if PAI was awarded the contract. *Id.*, Art. 3.1. The Teaming Agreement provided for the

2

1  exchange of proprietary information in order to satisfy the requirements of the RFP and further

2  provided that such information would be kept confidential for a period of three years from the date of

3  the agreement. *Id*., Art. 5.2. The Teaming Agreement provided that execution of the subcontract

4  envisioned in the Teaming Agreement between PAI and ISSi would result in termination of the

5  Teaming Agreement. *Id*., Art. 14.1(e).

6  In March 2000, PAI was awarded the OSIHMES contract. *Id*., ¶ 7. As previously agreed,

7  ISSi was awarded a subcontract ("the Subcontract") by PAI, and McCloy became Program Manager.

8  *Id*., ¶¶ 7-8, 17. PAI's president, Doan Phung, signed the Subcontract on behalf of PAI, while David

9  Dobson signed on behalf of ISSi. *Id*., ¶ 19. In addition, both Dobson and McCloy initialed the first

10  32 pages of the Subcontract. *Id*., ¶ 20. With the signing of the Subcontract, the Teaming Agreement

11  expired. Meagher Motion Decl., Ex. 4 (Teaming Agreement), Art. 14(e).

12  The Subcontract contained the following provision:

13  ### 4.7 RECRUITMENT OF COMPANY'S PERSONNEL AND NONCOMPETITION

15  During the period of performance of this subcontract, the
Subcontractor agrees not to solicit or offer work or employment to any
employee of the Company associated with the performance of the
16  subcontract.

17  Declaration of Q. Huy Do in Support of PAI Corporation's Motion for Summary Adjudication of

18  Issues ("Do Motion Decl."), Ex. A (Subcontract), § 4.7. The parties to the Subcontract did not

19  modify or amend Section 4.7. Joint Statement, ¶ 21.

20  The Subcontract further provided that it would be "interpreted and enforced in accordance

21  with the laws of the State of Tennessee, including statutes of limitations," Do Motion Decl., Ex. A

22  (Subcontract), Section 3.1, with the following caveat: "if the issue in dispute is not covered by the

23  state of Tennessee law or if there is a conflict between the state of Tennessee law and federal law,

24  i.e., decisions of federal courts and federal regulations and statutes, federal law shall apply." *Id*., §

25  4.16.

26  The Subcontract also contained the following integration clause:

27

28

3

1

**4.17 ENTIRE AGREEMENT**

2

3

4

5

6

This subcontract constitutes the entire understanding and agreement of and between the parties with respect to the subject matter hereof and supersedes all prior representations and agreements, oral or written. It shall not be varied except by an instrument in writing of subsequent date, duly executed by authorized representatives of both parties. All work performed by the Subcontractor, actions taken, and payments made, if any, under any other prior written or oral agreements, with respect to this subcontract, shall be deemed to have been work performed, actions taken, or payments made under this subcontract.

7

*Id.*, § 4.17.

8

Finally, the Subcontract specified that the period of performance would end on March 5,

9 2003. *Id.*, ¶ 1.3. That period was extended to March 5, 2005, in a modification by the parties

10 effective March 6, 2003. Do Decl., Ex. C (Modification).

11

**3. Agreements Signed by McCloy**

12 On March 2, 2000, McCloy received a letter (dated March 4, 2000) from PAI's president,

13 Doan Phung, confirming McCloy's appointment as Program Manager on the OSIHMES Contract

14 and offering her a salary of $92,000, PAI's standard benefits package, and an incentive bonus.

15 Declaration of Cecelia McCloy in Support of Motion for Partial Summary Judgment ("McCloy

16 Motion Decl."), ¶ 3 & Ex. 1 (March 2, 2000 Offer Letter). The letter specified that "[i]n accepting

17 this offer, you agree to abide by the rules and regulations of PAI Corporation, of ARC, and of the

18 United States." *Id.*

19 McCloy accepted PAI's offer by signing the March 2 Offer Letter and returning it to Doan

20 Phung, along with a letter containing some modifications of the terms of the agreement. *Id.*, Ex. 1.

21 In her letter, McCloy stated that she would work on site (that is, NASA /ARC) four 10-hour days,

22 Monday through Thursday, with eight hours of each of those days being charged to NASA and

23 another two hours commute time charged to PAI as overhead. *Id.* On Fridays, the "Technical

24 Manager will be in charge of the program." *Id.* McCloy explained that her "reason for joining PAI

25 [was] to facilitate [her] roll [sic] as Program Manager of the NASA-ARC [OSIHMES Contract]."

26 *Id.* She stated further, "[a]s a PAI employee I will have full authority to commit PAI resources to the

27 fullest extent on this important contract." *Id.* McCloy noted that she would remain President of ISSi

28 during the period of the OSIHMES Contract, stating, "[a]s you are aware, I will remain President of

4

**United States District Court**
For the Northern District of California

1   ISSi and continue to conduct business and marketing activities for that company." *Id.* The offer

2   letter and the acceptance are referred to in the Complaint, and herein, as "the Employment

3   Agreement." *See* Complaint, ¶ 44.

4        In conjunction with becoming Program Manager on the OSIHMES Contract, McCloy also

5   signed three confidentiality agreements ("the Confidentiality Agreements") and an agreement not to

6   disclose PAI trade secrets ('the Trade Secret Agreement"). Supplemental Declaration of Q. Huy Do

7   in Support of PAI Corporation's Opposition to Defendants' Motion for Partial Summary Judgment

8   ("Do Supp. Opposition Decl."), Ex. H. The Confidentiality Agreements were signed by McCloy on

9   March 24, 2000, June 6, 2000, and May 15, 2001. The terms of the Confidentiality Agreements are

10   identical, stating as follows:

11           Activities of the all PAI Corporation executives involve proprietary
information of the company. It is important that those entrusted with

12           this information keep that information confidential in all respects. The
following is a contractual agreement between PAI Corporation and the

13           undersigned.

14               1.    I will keep confidential all information given to me or
otherwise encountered (excluding information that can

15                    be readily found in published documents outside PAI).
I understand that disclosing such information to persons

16                    who do not have the right to know constitutes a betrayal
of trust. If there is any legal requirement to disclose, I

17                    will give PAI Corporation first right of refusal.

18               2.    I will not pass any proprietary/confidential information
to persons who do not have the right to know, within or

19                    without PAI. I understand that disclosing proprietary
information to persons outside PAI is prosecutable on

20                    the grounds of industrial spying.

21               3.    I will return to the authorized point-of-contact all
documents pertaining to the proprietary information at

22                    the end of the activity. In particular, I will not take any
proprietary information or materials with me when I

23                    terminate my employment with PAI.

24   *Id.*

25        McCloy signed the Trade Secret Agreement on March 23, 2000. The Trade Secret

26   Agreement defines trade secrets as follows:

27         •    Technical information: methods, processes, formulas, compositions, inventions,
machines, computer programs, and research projects.

28

5

1      •      Business information: customer lists, pricing data, sources of supply and marketing
              production, or merchandising systems or plans.
2

3    *Id.* The Trade Secret Agreement goes on to provide "[t]hat I shall not, during or any time after the

4    termination of the working relationship, disclose or divulge to others any trade secrets, confidential

5    information, or any other data of PAI in violation of this Agreement." *Id.* The Trade Secret

6    Agreement further required that:

7              upon termination of the relationship . . . I shall return to the source all
               documents relating to the related firm, including, but not necessarily
8              limited to, drawings, blueprints, reports, manuals, correspondences,
               customer lists, computer programs, and all other materials and all
9              copies obtained thereof relating in any way to its business, or in any
               way obtained by me during the course of the relationship. I further
10             agree that I shall not retain any copies of the foregoing.

11   *Id.*

12                   **4.      McCloy's Duties as Program Manager**

13         McCloy states that she had the following duties as program manager:

14             a.     I was the primary contact person for employees of the
                      customer, NASA ARC.
15
               b.     I supervised approximately 45-50 employees in the areas of
16                    safety and health, environmental support and medical services.
                      The employees were employed by either PAI or one of
17                    its subcontractors.

18             c.     I monitored the status of available government funding for the
                      contract work.
19
               d.     I assisted the Business Manager in managing PAI's vendors
20                    that were supplying material and supplies for PAI's work at
                      NASA ARC.
21
               e.     I made certain that PAI's employees who were working at
22                    NASA ARC had the necessary resources to perform the work
                      required by the contract.
23
               f.     I assisted in the preparation of the budget for the work at
24                    NASA ARC.

25   McCloy Motion Decl., ¶ 7.

26         On the other hand, McCloy states that she "did not participate in preparing or reviewing any

27   overall corporate strategy such as, for example, a Five Year Plan for PAI [and she] never participated

28   in any discussions concerning any project that PAI was performing other than the work at NASA

United States District Court
For the Northern District of California

6

1 ARC. *Id.*, ¶ 11. She states that she did participate in one meeting involving a PAI future business
2 opportunity, namely, a Department of Energy contract, but she participated only in her capacity as
3 President of ISSi and not as a PAI program manager. *Id.*, ¶ 12. She states that she did not have any
4 ownership interest in PAI and did not attend any PAI retreat, annual meeting, or meeting of its board
5 of directors. *Id.*, ¶ 13. During the time McCloy was PAI's Program Manager on the OSIHMES
6 contract, she neither worked at nor visited PAI's corporate office in Oak Ridge, Tennessee. Joint
7 Statement, ¶ 23.

8 On May 3, 2001, PAI changed McCloy's status from full-time to part-time, but her job
9 responsibilities did not materially change. McCloy Motion Decl., ¶ 6.

10 By early 2002, tensions had arisen between PAI and McCloy. A trip report dated 1/15/02 -
11 1/17/02, describes the following discussion between PAI executive Zimmerman and Cecelia
12 McCloy:

13     My meeting with Ceil regarding her ISSI business conflict and our PAI
    Team concern took place later that afternoon. I told her our goal was
14     to provide the best services we can on our contracts and its hypocritical
    to say that when our Program Manager at NASA is not providing full-
15     time support to the project. I explained the conflict of interest she
    presents is the basis for our considering replacing her. She stated she
16     would not leave voluntarily. She said if she was forced to leave PAI
    will not be awarded the option years of the contract and ISSI will get
17     the work. She stated that the conflict of interest concern is just a
    disguise because what Doan is really concerned about is the recompete
18     of the contract when this one is over. She went on to say that ISSI
    benefits are much better than PAI's and as a result she will be able to
19     easily draw PAI employees over to ISSI. She said a number of PAI
    employees have already commented on the disparity of the benefits
20     between the two companies, especially the vacation and the 401k
    programs. . . . She reminded me that it was because of her that PAI
21     won this contract and has no doubts the client wants her. . . . She said
    her company is up to 30 employees and is doing very well. If PAI is
22     interested in reversing roles on the recompete she is willing to
    subcontract to us. . . .
23

24 Do Motion Decl., Ex. K.

25 PAI terminated McCloy as program manager on the OSIHMES Contract effective March
26 2002. Joint Statement, ¶ 22. The Subcontract with ISSi was not terminated, however. Complaint at
27 15.
28

United States District Court
For the Northern District of California

1    Doan Phung asserts that he recently learned that McCloy engaged in conduct while Program

2   Manager that constituted a breach of fiduciary duty, stating as follows:

3        Within the past year, PAI learned that during Defendant McCLoy's
         employment as PAI's Program Manager, she charged her time to the
4        government at the PAI's proposed and accepted rate. But she also
         worked for PAI's subcontractor ISSi whom she was supposed to
5        supervise, and may have charged a higher rate which would reflect
         back in the form of higher overhead and G & A rates that ISSi charged
6        PAI for [more] than 10 other ISSi employees assigned on the PAI
         OSIHMES Contract. She also charged both PAI and ISSi for the same
7        vacation days and holidays.

8   Phung Supp. Motion Decl., ¶ 15.

9        **5.    McCloy's Access to Confidential Documents**

10    PAI alleges in its Complaint that McCloy obtained various confidential and proprietary

11   documents while working as Program Manager and that she did not return them after she was

12   terminated. Complaint, ¶ 130; *see also* Declaration of Patricia A. Meagher in Support of

13   Defendants' Motion for Partial Summary Judgment ("Meagher Motion Decl."), Ex. 1 (PAI

14   Corporation's Responses to Defendant McCloy's First Set of Interrogatories) at 7 (identifying

15   specific documents and information McCloy allegedly did not return). McCloy offers the following

16   responses as to the specific documents identified by PAI that it alleges McCloy did not return:

17        •    7 volumes of PAI policies and procedures: "I do not have a
               recollection of reviewing or having in my possession seven
18             volumes of PAI Policies and Procedures;"

19        •    Information on salaries and benefits, including the Total
               Compensation Plan: "As a PAI employee, I knew the
20             Company's employee benefits for employees at NASA [ARC].
               I had no access to specific information on PAI individual
21             employee salaries other than my own;"

22        •    Names, addresses and salaries of all PAI employees assigned to
               work onsite at ARC: "As NASA ARC Program Manager, I
23             knew the names and work addresses of the PAI employees
               assigned to work on site at ARC, and this information was
24             available to all workers at NASA ARC. I had no access to
               specific PAI employee salary information other than my own;"

25
          •    Proposals of PAI including cost strategies and numbers: "As
26             NASA ARC Program Manager, I had no access to any proposal
               of PAI other than a technical proposal volume provided to ISSi
27             by PAI when they teamed together in 1999 for the OSIHMES
               contract;"
28

1          •        PAI prior performance record that is not available to PAI
2                   competitors: As NASA ARC Program Manager, as a
                    requirement for the contract performance, I prepared
3                   performance self-assessments for the project in 2000 and 2001.
                    In addition, I received copies of the Award Fee Determinations
4                   issued to PAI by NASA under the OSIHMES contract. I had
                    no information on PAI's performance

5          •        PAI forms for conducting business: "As NASA ARC Program
6                   Manager, I had access to general PAI forms for conducting
                    business;"

7          •        PAI NASA ARC health and safety plan: "As NASA ARC
                    Program Manager, I had access to the PAI NASA ARC health
8                   and safety plan. Upon my termination by PAI, I left all the
                    documents at NASA ARC in binders for the incoming Program
9                   Manager, Bob Garton, in the Program Manager's Office;"

10         •        PAI NASA ARC contract transition plan: "As NASA ARC
                    Program Manager, I was charged with assisting PAI implement
11                  the contract transition plan, which ended in 2000;"

12         •        PAI NASA ARC procurement and property management plans;
                    "As NASA ARC Program Manager, I had access to the PAI
13                  NASA ARC procurement and property management plans.
                    Upon termination by PAI, I left all documents at NASA ARC
14                  in binders for the incoming Program Manager, Bob Garton, in
                    the Program Manager's office;"
15
           •        PAI NASA ARC OSIHMES proposal: "As President of ISSi
16                  and PAI's teaming partner on the OSIHMES proposal, I had a
                    copy of the technical volume of the OSIHMES Proposal which
17                  was provided to me by PAI;" and

18         •        PAI policies and procedures: "As NASA ARC Program
                    Manager, I had access to general PAI employee policies and
19                  procedures made available to PAI employees."

20    Supplemental Declaration of Cecelia McCloy in Support of Motion For Partial Summary Judgment

21    ("McCloy Supp. Motion Decl."), ¶ 5. McCloy further states that she left in the NASA ARC Program

22    Manager office "all PAI information that [she] used to perform [her] duties." *Id*., ¶ 6. She

23    acknowledges, however, that ISSi continues to maintain information about the OSIHMES contract in

24    its files because neither the OSIHMES prime contract nor the Subcontract with ISSi have been

25    formally "closed out." *Id*., ¶ 10.

26         **6.       The OSIHM and ES Contracts**

27          In December 2003, NASA decided that instead of renewing the OSIHMES contract, it would

28    split the work covered under it into two service contracts, both of which would be rebid: the OSIHM

1 Contract (covering occupational safety, industrial hygiene, and medical services) and the ES
2 Contract (covering environmental services). Complaint at 15; Supplemental Declaration of Doan
3 Phung (Phung Supp. Opposition Decl."), ¶ 8.

4 The ES contract was competed in 2004. Joint Statement, ¶ 28. Proposals were submitted by
5 ISSi and PAI, as well as two other entities, JCI and AECOM/Dynamac Joint Venture. *See* Do
6 Motion Decl., Ex. X (NASA ARC Source Selection Statement). NASA ARC awarded the ES
7 Contract to ISSi. Joint Statement, ¶ 28.

8 The OSIHM Contract was competed in 2005. Joint Statement, ¶ 29. Although both PAI and
9 ISSi submitted proposals, the contract was awarded to a third party. *Id.*

10 The Request for Proposals (RFP) for the ES Contract set forth three evaluation factors for
11 awarding the ES contract: 1) Mission Suitability; 2) Past Performance; and 3) Cost. Joint Statement,
12 ¶ 30; *see also* Do Motion Decl., Ex. J (§ M of RFP for ES Contract, describing evaluation factors).
13 The Mission Suitability factor, in turn, includes consideration of, *inter alia*, the applicant's staffing
14 plan and the qualifications of any "key persons" committed to work on the contract if awarded. *See*
15 *id.*, §§ M.2(c)(1)(ii)(A), M.2(c)(2)(i)(B), M.S(c)(2)(iii)(B), M.2(d)(2)(i), M.2(d)(2)(ii) & M.2(e)(2).
16 According to a Source Selection Statement by NASA in response to a later challenge by PAI to the
17 selection of ISSi for the ES contract, "[t]he number of significant strengths (8) and lack of any
18 significant weaknesses in the Mission Suitability factor was a significant consideration in selecting
19 the ISSi proposal. In contrast, no other proposal contained more than four (4) significant strengths
20 and all had at least one significant weakness." Do Motion Decl., Ex. Y.

21 PAI asserts that in preparing its proposals for the OSIHM contract and the ES contract,
22 McCloy used proprietary PAI information she had obtained as Program Manager – including PAI's
23 1999 proposal for the OSIHMES Contract, information about PAI salaries, and benefits and personal
24 information about PAI employees such as home addresses – to recruit PAI employees working on the
25 OSIHMES contract and to create more competitive proposals. PAI points to a chart in ISSi's ES
26 proposal that is almost identical to one used in PAI's 1999 proposal, *see* Do Supp. Opposition Decl.,
27 Ex. S at D 5700 (ISSi proposal) & Ex. O at D00136, as well as another chart in ISSi's ES proposal
28

10

1   that compares the employee benefits offered by PAI with those offered by ISSi. *See* Do Supp.

2   Opposition Decl., Ex. R.

3          With respect to ISSi's efforts to recruit PAI employees, PAI points to: 1) written and verbal

4   communications between ISSi and PAI employee Tom Anderson; 2) letters sent by McCloy on

5   ISSi's behalf to PAI employees Amy Johnson, Chander Sujan and Rob Clark inviting these

6   employees to submit resumes to ISSi if they were interested in being included in the ES proposal;

7   and 3) verbal communications between ISSi and PAI employee Don Daines. PAI also notes that in

8   the ES Proposal, ISSi promises to retain "at least 95% of qualified incumbent employees." Do

9   Motion Decl., Ex. V.

10                              **a.      Tom Anderson**

11          On August 16, 2004, ISSi sent PAI employee Tom Anderson (identified by PAI as one of its

12   key employees) a letter stating, in part, as follows:

13          *Based on your interview and discussions with [ISSi], I am pleased to
            offer you a position* as a Senior Environmental Manager in our Moffett

14          Field, CA office. In this position you will report directly to Cecelia
            McCloy at a starting salary of $89,000 per year subject to normal

15          withholdings. Along with your salary, you will also receive a $5,000
            contract start-up bonus (subject to normal withholdings) This

16          employment offer is contingent upon [ISSi] being awarded the NASA
            Ames Research Center Environmental Services contract and your

17          position being fully funded. In the event of this award, we would like
            for you to start work on the contract start date, which is currently

18          anticipated to be April 1, 2005. In order for us to win this important
            award we need your cooperation to review your formatted resume and

19          return it to us signed by August 20, 2004.

20   Do Motion Decl., Ex. N (August 16 Letter) (emphasis added). McCloy also testified in her

21   deposition that she had conversations with Anderson about the possibility of listing him as key

22   personnel on the ES contract proposal. *Id.*, Ex. P (McCloy Depo. excerpt). According to ISSi,

23   Anderson orally advised ISSi "what his salary requirement was based on [what] his then-current

24   salary was at PAI." Do Motion Decl., Ex. Q (ISSi Interrogatory Responses). According to ISSi,

25   Tom Anderson agreed to be listed as "key personnel" in the ISSi proposal around August 2004. *Id.*

26   The "Key Personnel" section of ISSi's ES proposal indicates a 100% commitment to the project by

27   Tom Anderson. *See* Do Motion Decl., Ex. O (ES proposal excerpt).

28

11

1    As a PAI employee, Tom Anderson signed an Agreement on Non-Disclosure of Trade

2  Secrets on March 22, 2000. Do Supp. Opposition Decl., Ex. W. The text is identical to that

3  contained in McCloy's Trade Secret Agreement. Anderson also completed a conflict of interest form

4  on March 30, 2000. *Id.*

5                    **b.    Amy Johnson, Chander Sujan and Rob Clark**

6    Three PAI employees who worked side-by-side with ISSi employees at NASA ARC on the

7  OSIHMES Contract – Amy Johnson, Chander Sujan, and Rob Clark – received letters from Cecelia

8  McCloy dated October 15, 2004, inviting them to submit their resumes to ISSi in connection with

9  ISSi's proposal for the OSIHM Contract. *See* Do Motion Decl., Exs. D, E, & F (letters); Phung

10  Motion Decl., ¶ 12 (stating that Johnson, Sujan, and Clerk worked side-by-side with ISSi employees

11  on the OSIHMES contract). The letter stated:

12        Integrated Science Solutions, Inc. (ISSi) is pursuing the NASA Ames
          Research Center's Occupational Health, Industrial Hygiene, and
13        Medical Services Request for Proposal anticipated for release this
          November. ISSi is a high quality, high performance science and
14        engineering practice that delivers best value solutions to our customers
          and fosters an entrepreneurial environment.
15
          We take pride in satisfying our customers by delivering products and
16        services that meet or exceed their specified requirements, at the agreed
          price, within schedule, while protecting their assets and eliminating
17        risks and liabilities. Our employees commit to continuously improve
          the processes by which we provide our services, so that our work
18        meets requirements and is done right the first time.

19        As a quality small business, ISSi will propose as the prime contractor
          for this important bid. If you would like to be considered by ISSi,
20        *please send us your resume in the strictest of confidence.* We look
          forward to hearing from you.
21

22  Do Motion Decl., Exs. D, E & F (emphasis added).

23                    **c.    Don Daines**

24    According to PAI, ISSi stated in its interrogatory responses that "Mr. Dains and ISSi

25  employees had discussions in 2004 about the possibility of contractor turnover at NASA AMES."

26  Plaintiff's Motion at 15. Daines was listed as key personnel in ISSi's OSIHM Proposal. Do Decl.,

27  Ex. R (excerpt of proposal).

28

12

**B.      Claims Asserted**

In the Complaint, PAI asserts the following claims:

Claim One: Breach of fiduciary duty (McCloy);

Claim Two: Breach of contract based on Employment Agreement, Confidentiality Agreements and Trade Secrets Agreement (McCloy);

Claim Three: Misappropriation of trade secrets based on Trade Secrets Agreement (McCloy);

Claim Four: Breach of Contract based on Teaming Agreement and Subcontract (ISSi)

Claim Five:   Fraud (all defendants);

Claim Six: Negligent interference with OSIHMES contract (all defendants);

Claim Seven: Intentional interference with OSIHMES contract (all defendants);

Claim Eight: Intentional interference with prospective economic advantage under OSIHMES contract (all defendants);

Claim Nine: Negligent interference with prospective economic advantage under OSIHMES contract (all defendants);

Claim Ten: Intentional interference with employment agreements (all defendants);

Claim Eleven: Negligent interference with employment agreements (all defendants);

Claim Twelve: Violations of Cal. Bus. & Prof. Code §§ 17200 *et seq.*

ISSi asserted counterclaims that are not at issue in the summary judgment motions.

**C.      The Motions**

**1.      PAI's Summary Judgment Motion**

PAI seeks summary judgment in its favor on issues relating to Claims Four, Eight and Nine. With respect to Claim Four (Breach of Contract), PAI asks the Court to hold, as a matter of law, that ISSi's efforts to recruit PAI employees violated the plain terms of Section 4.7 of the Subcontract, that the breach was willful and that it was the proximate cause of PAI's damages because it allowed ISSi to win the ES contract rather than PAI. In connection with the breach of contract claim, PAI asserts that Tennessee law rather than California law should apply.

With respect to Claims Eight and Nine, for intentional and negligent interference with prospective economic advantage, PAI asks the Court to find, as a matter of law, that: 1) PAI had an

13

1 economic relationship with NASA AMES with a probability of economic benefit because contracts
2 like the OSIHMES contract are typically extended; 2) ISSi knew of PAI's relationship with NASA
3 AMES and was aware that PAI would be bidding on the ES Contract; 3) ISSi's solicitations of PAI
4 employees violated Section 4.7 of the Subcontract (see above) and was, therefore, independently
5 wrongful; and 4) ISSi's actions actually interfered because they allowed ISSi to displace PAI as the
6 incumbent contractor.

7 In their Opposition, Defendants argue that with respect to the breach of contract claim (Claim
8 Four), California rather than Tennessee law should be applied. Defendants further assert that
9 summary judgment should be denied on this claim because the meaning of Section 4.7 is ambiguous,
10 requiring consideration of extrinsic evidence. Defendants also take the position that PAI's proposed
11 interpretation of Section 4.7 would violate public policy, although they do not seek summary
12 judgment on that issue. In addition, Defendants argue that there are fact questions that preclude
13 summary judgment as to whether their actions constituted a breach, whether their actions were
14 willful and whether their actions were the proximate cause of any damages PAI may have incurred.

15 With respect to the prospective economic advantage claims, Defendants assert that summary
16 judgment should be denied because the likelihood that a government contract will be rebid does not
17 create a *probability* a future economic benefit, given that the future award of the contract will occur
18 only after a full and open competitive bidding process. Defendants further assert that there is no
19 evidence of intent and that PAI also fails to establish causation for the same reasons its causation
20 argument fails on the breach of contract claim.

21 **2. ISSi's Summary Judgment Motion**

22 Defendants seek summary judgment on Claims One through Four and Seven through Twelve.
23 With respect to Claim One, for breach of fiduciary duty, Defendants argue that the claim is
24 barred by California's three-year statute of limitations under California Civil Code § 3426.6.
25 Alternatively, Defendants assert that McCloy could not have breached a fiduciary duty to PAI
26 because she was not an officer of PAI who participated in the management of the corporation.

27 Defendants argue that the breach of contract claim against McCloy (Claim Two) also fails on
28 statute of limitations grounds, pointing to California's four-year statute of limitations for breach of

14

1  contract claims and the fact that McCloy was terminated by PAI in March 2002. *See* Cal. Code Civ.

2  Proc. § 337. In addition, Defendants assert, to the extent the claim is based on McCloy's alleged

3  improper use of PAI trade secrets and proprietary information, there is no evidence that McCloy

4  misappropriated any such information and documents in the face of McCloy's own statement that

5  she did not use these documents and information improperly and that she left all PAI information in

6  the program manager's office. For the same reason, Defendants argue, Claim Three

7  (misappropriation of trade secrets) fails.

8  Defendants argue that Claim Four (breach of contract by ISSi based on alleged violation of

9  the Teaming Agreement and the Subcontract) also fails as a matter of law because: 1) the Teaming

10  Agreement became void when the Subcontract was signed, on March 6, 2000, and there is no

11  evidence of a breach prior to that date; and 2) there is no evidence to support the causation element

12  as to the alleged breach of the Subcontract.

13  Defendants argue that Claims Six through Nine fail because they are based on the allegation

14  that Defendants conspired against PAI, but there are not two legally capable parties to the alleged

15  conspiracy. In particular, McCloy cannot be held liable for conspiring to breach her employment

16  contract because a party to a contract cannot be held liable in tort for interference with the contract.

17  In addition, ISSi can only act through its employees and cannot conspire with its corporate principals

18  for acts taken in their official capacities. As there is no allegation that either McCloy or Dobson was

19  acting outside his/her official capacity, there can be no conspiracy between McCloy and Dobson, on

20  one hand, and ISSi, on the other.

21  Defendants argue that claims Eight and Nine (intentional and negligent interference with

22  prospective economic advantage) fail because there is no evidence of causation and, therefore, there

23  is not a reasonable probability that but for the alleged tortious interference PAI would have been

24  awarded the ES Contract or the OSIHM Contract.

25  Defendants argue that Claims Ten and Eleven (intentional and negligent interference with

26  employment agreements) fail because there is no evidence that any of their employees breached their

27  employment contract with PAI.

28

15

1    Defendants argue that Claim Twelve (unfair competition in violation of Cal. Bus. and Prof.
2  Code §§ 17200 *et seq.*) fails because where, as here, the parties are direct competitors, conduct is
3  found to be unfair competition only where it threatens an incipient violation of an anti-trust law or
4  significantly harms competition. According to Defendants, the conduct alleged here does not meet
5  that test.

6    In its Opposition, PAI argues that there is a fact question as to whether California or
7  Tennessee law applies to the breach of fiduciary duty claim (Claim One). PAI asserts that the choice
8  of law provisions in the Teaming Agreement and the Subcontract indicate that the parties intended
9  that Tennessee law would apply to the breach of fiduciary duty claim. PAI further points out that
10  under Tennessee law, there is a tolling provision that applies to fraudulent concealment of facts
11  evidencing the breach of fiduciary duty and argues that there are factual questions as to whether that
12  provision applies here. PAI also argues that there is a fact question as to whether McCloy was an
13  officer of PAI who owed PAI a fiduciary duty.

14    With respect to Claim Two (breach of contract against McCloy), PAI asserts that there is
15  again a factual dispute concerning the intentions of the parties with respect to choice of law. PAI
16  notes that under Tennessee law, the limitation period for this claim would be six years rather than
17  four years. PAI also argues that under either Tennessee or California law, this claim accrued when
18  McCloy used PAI's confidential and propriety information to solicit PAI employees, in August 2004
19  and not, as Defendants assert, on the date of her termination in 2002. Therefore, under either state's
20  statute of limitations the claim is timely, PAI argues.

21    PAI argues that there is ample evidence of misappropriation of trade secrets to support Claim
22  Three and further, that the claim is not barred on statute of limitations grounds because, as asserted
23  with respect to Claim Two, the claim did not accrue until at least August 2004, when ISSi allegedly
24  used PAI's proprietary information in the ES competition.

25    Regarding Claim Four (breach of contract against ISSi), PAI argues, as it did in its summary
26  judgment motion, that the undisputed evidence establishes that ISSi breached Section 4.7 of the
27  Subcontract and that the breach was the proximate cause of damages to PAI.

28

United States District Court
For the Northern District of California

16

1       PAI argues that ISSi is incorrect with respect to its assertion that Claims Six through Nine
2   fail because there are not two parties who can conspire. It points to the fact that McCloy was a PAI
3   employee at the time of the alleged conspiracy, arguing that as a result, she was acting outside the
4   scope of her authority as an ISSi employee; as such, PAI argues, McCloy could conspire with ISSi
5   and Dobson to interfere with the OSIHMES contract.

6       With respect to Claims Eight and Nine (intentional and negligent interference with
7   prospective economic advantage), PAI asserts that these claims are based on multiple acts of
8   wrongful conduct, including breach of contract by McCloy and ISSi and violation of the
9   Procurement Integrity Act, 41 U.S.C. § 423, which prohibits the unauthorized disclosure of
10  confidential contractor bid or proposal information. PAI further asserts that this conduct was the
11  proximate cause of damages to PAI, because, as also asserted in PAI's summary judgment motion,
12  PAI came in second after ISSi in the ES competition and, therefore, would have been awarded the
13  contract if ISSi had not received the award. PAI rejects ISSi's assertion that a future contract based
14  on a competitive bidding process could not give rise to a prospective economic advantage because it
15  is speculative, arguing that as an incumbent contractor with a good track record, PAI had a strong
16  chance of winning the ES contract.

17      PAI argues that ISSi is not entitled to summary judgment on Claims Ten and Eleven
18  (intentional and negligent interference with employment agreement) because there is evidence of
19  such breaches in the record, namely, evidence that PAI employees were required to complete conflict
20  of interest disclosure forms and non-disclosure agreements, as well as evidence that Tom Anderson
21  disclosed his PAI salary to ISSi.

22      As to Claim Twelve (unfair competition under Cal. Bus. & Prof. Code §§ 17200 *et seq.*), PAI
23  argues that there is a material issue of fact because the evidence shows that ISSi harmed competition
24  by tainting the bidding process for all of the competitors for the contracts. In addition, PAI argues
25  that it can establish a Section 17200 violation based on unlawful conduct, in which case, it is not
26  required to show harm to competition. PAI argues that it has established unlawful conduct,
27  referencing the arguments raised as to its other claims.

28

United States District Court
For the Northern District of California

17

**III. ANALYSIS**

**A. Legal Standard Applicable to Summary Judgment Motions**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Further, "*Celotex* requires that for issues on which the movant would bear the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact," that is, "that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir.1993). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to designate "specific facts showing there is a genuine issue for trial." *Id.* at 323. On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant. *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 255 (1986).

**B. Claim One: Breach of Fiduciary Duty**

**1. Whether California Statute of Limitations Bars Claim**

Defendant asserts that summary judgment should be granted in its favor on Claim One on the basis that this claim is barred under California Civil Code § 3426.6, which establishes a three-year statute of limitations for misappropriation claims. Plaintiff does not dispute that to the extent this claim is based on alleged misappropriation of proprietary information and trade secrets, § 3426.6 would be applicable if California law were applied. Rather, it asserts that there is a question of fact regarding whether the parties intended that the choice of law provisions in the Teaming Agreement and Subcontract, designating Tennessee law, would apply to claims such as this one. Plaintiffs further assert that under Tennessee law, there is a tolling provision that allows a cause of action for breach of fiduciary duty up to one year after the alleged breached is or should have been discovered

18

1 where there has been fraudulent concealment, *see* T.C.A. § 48-18-601, and that there is evidence that

2 this tolling provision applies. The parties are in agreement that there is a true conflict between the

3 statutes of limitations of Tennessee and California.

4 In determining which state's substantive law applies to state law claims, a federal district

5 court applies the choice of law principles of the state in it which sits. *Arno v. Club Med, Inc.*, 22

6 F.3d 1464, 1467 (9th Cir. 1994). Thus, the Court looks to California choice of law principles to

7 determine whether the choice of law provisions cited by PAI in the Teaming Agreement and

8 Subcontract apply here. In *Nedlloyd Lines B.V. v. Superior Court*, the California set forth rules for

9 determining when choice of law provisions should be enforced. 3 Cal. 4th 459, 466 (1992). It

10 explained the inquiry as follows:

11
12
13
14
15
16
17
18
> In determining the enforceability of arm's-length contractual choice-of-law provisions, California courts shall apply the principles set forth in Restatement section 187, which reflect a strong policy favoring enforcement of such provisions. . . . More specifically, Restatement section 187, subdivision (2) sets forth the following standards: "The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties."

19

20 *Id.* (quoting Restatement Second of Conflict of Laws, section 187, subdivision 2).

21 In addition, *Nedlloyd* explains that where there is a question as to whether a claim falls within

22 the scope of choice of law provision, or whether the provision is ambiguous, this question is

23 normally resolved under the law of the state designated in the choice of law provision. *Id.*, 3 Cal. 4th

24 at 469 n.7; *see also Washington Mut. Bank v. Superior Court*, 24 Cal. 4th 906, 916 (2001) ("Pursuant

25 to *Nedlloyd*, the trial court should first examine the choice-of-law clause and ascertain whether the

26 advocate of the clause has met its burden of establishing that the various claims of putative class

27 members fell within its scope"). However, in *Nedlloyd*, the court applied the law of California (the

28 forum state) because the parties had not supplied the court with evidence of the relevant aspects of

United States District Court
For the Northern District of California

19

1 the law that was designated, Hong Kong law. 3 Cal. 4th at 469 n.7; *see also Hambrecht & Quist*
2 *Venture,* 38 Cal. App. 4th 1532, 1540 n.5 (1995) (applying California law to determine scope of
3 choice of law provision where parties had failed to brief the interpretation issues under designated
4 law, in reliance on *Nedlloyd*).

5     In *Nedlloyd*, the Court specifically addressed whether the choice-of-law provision in a
6 shareholder agreement in that case, which specified that "this agreement shall be governed by and
7 construed in accordance with Hong Kong law," applied to a breach of fiduciary duty claim. *Id.* at
8 468. The breach of fiduciary duty claim was based on "express and implied obligations under the
9 shareholders' agreement." *Id.* at 1150. The court held that it did, stating as follows:

10         When two sophisticated, commercial entities agree to a choice-of-law
        clause like the one in this case, the most reasonable interpretation of
11         their actions is that they intended for the clause to apply to all causes
        of action arising from or related to their contract.
12

13 *Id.* The court went on to hold generally,

14         [W]e hold a valid choice-of-law clause, which provides that a specified
        body of law "governs" the agreement" between the parties,
15         encompasses all causes of action arising from or related to that
        agreement, regardless of how they are characterized, including tortious
16         breaches of duties emanating from the agreement or the legal
        relationship it creates.
17

18 *Id.* at 470.

19     Here, the Court must first determine the scope of the choice of law provisions in the Teaming
20 Agreement and the Subcontract and, in particular: 1) whether they are ambiguous; and 2) whether
21 they cover the breach of fiduciary duty claim against McCloy. Under *Nedlloyd*, this inquiry would
22 ordinarily be governed by Tennessee law, but as neither of the parties has briefed this question, the
23 Court applies California law instead.

24     Under California law, "[e]xtrinsic evidence is relevant . . . in interpreting a written instrument
25 only if the instrument's language is ambiguous." *Lang v. TIG Ins. Co.*, 68 Cal. App. 4th 1179, 1185
26 (1998). The question of whether a contract term is ambiguous is a matter of law. *Perez-Encinas v.*
27 *AmerUS Life Ins. Co.*, 468 F. Supp. 2d 1127, 1133 (N.D. Cal. 2006) (applying California law to
28 question of contract interpretation). Courts look first to the plain meaning of the words of the

20

1 contract. *Id.* A contract provision will be considered ambiguous when a contract provision is
2 capable of two or more interpretations, both of which are reasonable. *Id.* However, "[c]ourts will
3 not strain to create an ambiguity where none exists." *Id.*

4 The choice of law provision in the Subcontract is straightforward and clear.[2] Whether this
5 provision extends to claims asserted against McCloy that are not based on express provisions of the
6 Subcontract, such as the breach of fiduciary duty claim, is a difficult legal question but is not
7 sufficient to render the choice of law provision ambiguous such that a question of fact arises. The
8 case cited by PAI, *Putnam v. Putnam Lovell Group NBF Securities, Inc.*, 2006 WL 1821207, *4
9 (N.D. Cal. June 30, 2006), is distinguishable. There, the court was required to consider extrinsic
10 evidence because the plaintiff alleged that a choice of law provision in a written contract was
11 superceded by a subsequent oral agreement. There is no such allegation here. Therefore, the Court
12 is not persuaded that it is appropriate to consider extrinsic evidence in determining the scope of this
13 provision. Nor has PAI pointed to any specific evidence that might be helpful in interpreting the
14 Subcontract's choice of law provision.

15 Next, the Court turns to the question of whether the choice of law provision in the
16 Subcontract extends to PAI's breach of fiduciary duty claim against McCloy. Under California law,
17 "[t]here are *two kinds* of fiduciary duties – those imposed by law and those undertaken by
18 agreement." *GAB Bus. Servs., Inc. v. Lindsey & Newsom Claim Servs., Inc.*, 83 Cal. App. 4th 409,
19 416 (2000). It appears to be undisputed that in this case, the fiduciary duty alleged is of the former
20 sort. In support of this conclusion, the Court notes that the Subcontract provided that Cecelia
21 McCloy would be designated key personnel on the OSIHMES contract but did not set forth specific
22 obligations on the part of McCloy. In contrast, the claim in *Nedlloyd* was based on terms in the
23 contract between the parties. Notwithstanding this distinction, however, the broad language of
24 *Nedlloyd* – particularly the statement that choice of law provisions cover breaches of duties that

25

26 [2] Because the Teaming Agreement was superceded by the Subcontract, the choice of law
provision in the Teaming Agreement does not apply to this claim, which accrued after the Subcontract
27 was executed. As discussed below, however, in reaching this conclusion, the Court *does not* find that
the confidentiality obligations contained in the Teaming Agreement became inoperative at the time when
28 the Subcontract was signed.

United States District Court
For the Northern District of California

21

1 emanate from relationships created under the agreement – supports the conclusion that the choice of
2 law provisions here are binding with respect to the breach of fiduciary duty claim against McCloy.
3 Further, it is a generally accepted principal of contract law that a third-party beneficiary of a contract
4 may be bound by contractual provisions in the contract. *See Trans-Tec Asia v. M/V Harmony*
5 *Container*, 435 F. Supp. 2d 1013, 1028 n.17 (C.D. Cal. 2005) (citing cases in support of this
6 proposition). To the extent the Subcontract established a contractual obligation on the part of PAI to
7 employ McCloy, she may be bound by the choice of law provisions in those agreements. Therefore,
8 the Court concludes that Claim One falls within the scope of the choice of law provisions in the
9 Subcontract.

10 Next, the Court must determine whether the additional requirements set forth in *Nedlloyd* are
11 met, namely, whether there is a substantial relationship between Tennessee law and the parties or
12 transaction and whether application of Tennessee law with respect to the limitations period would
13 conflict with a fundamental policy of California. With respect to the first factor, it is undisputed that
14 there is a substantial relationship between Tennessee law and the parties, given that PAI is a
15 Tennessee corporation with its principal place of business in Tennessee. Nor have the parties
16 asserted that application of Tennessee's statute of limitations would violate any fundamental public
17 policy of California. Therefore, the Court concludes that the Tennessee statute of limitations should
18 be applied to this claim.

19 The Court rejects Defendants' assertion that even if the choice of law provision applied to the
20 substance of Claim One, it would not extend to application of the Tennessee statute of limitations to
21 that claim. *See* Defendants' Reply at 6-7. In support of this assertion, Defendants cite to the *Erie*
22 doctrine and cases that rely upon it. *See Klingbiel v. Lockheed Aircraft Corp.*, 372 F. Supp. 1086
23 (N.D. Cal. 1971); *McMillan v. Douglas Aircraft Co.*, 90 F. Supp. 670 (S.D. Cal. 1950). These cases
24 do not involve contractual choice-of-law provisions and are not on point. Further, the Court notes
25 that California courts, in more recent decisions than those cited by Defendants, have expressly
26 rejected the traditional distinction between procedural and substantive law in determining whether
27 choice of law provisions extend to statutes of limitations. *See Hambrecht*, 38 Cal. App. 4th at 1539-
28 44. Rather, they have held that a general reference to the law of a particular jurisdiction, without

22

1 limitations or qualifications, encompasses the statutes of limitations of that jurisdiction (but not the
2 choice of law rules). *Id.*

3   Having concluded that the California statute of limitations does not apply to Claim One, the
4 Court finds that Defendants are not entitled to summary judgment on this basis.[3]

**2.   Whether McCloy was an Officer Who Owed a Fiduciary Duty to PAI**

6   Defendants argue in the alternative that Claim One fails because there is no evidence that
7 McCloy exercised the sort of discretionary authority that is necessary to give rise to a fiduciary duty.
8 Plaintiff, on the other hand, asserts that there are factual questions on this issue that preclude
9 summary judgment. Because both parties relied on California law – and because PAI stipulated that
10 it could find no difference between California and Tennessee law on this issue[4] – the Court relies on
11 California law as well.

12   Under California law, "an officer who participates in management of the corporation,
13 exercising some discretionary authority, is a fiduciary of the corporation as a matter of law.
14 Conversely, a 'nominal' officer with no management authority is not a fiduciary." *GAB*, 83 Cal.
15 App. 4th at 420-21.  The *GAB* court further explained that "[w]hether a particular officer participates
16 in management is a question of fact" but that "once this factual prerequisite is established, the law
17 imposes a fiduciary duty." *Id.* Finally, the court opined, "we expect that in most cases, this test will
18 be easily met." *Id.*

19   Here, Defendants assert McCloy was merely a *program* manager and as such, did not
20 participate in *corporate* management, as envisioned in *GAB*.  The Court finds no grounds for
21 drawing this sort of bright-line distinction.  Rather, the Court concludes that there is evidence in the
22 record regarding McCloy's responsibilities as a program manager that could support a finding that
23 she participated in management and exercised some discretionary authority.  As such, summary
24 judgment in Defendants' favor on this issue is inappropriate.

25

26   [3] The Court notes that Defendants do not dispute that there are factual questions regarding
27 tolling under Tennessee law and, therefore, if the Tennessee statute of limitations applies, summary
judgment on this question is not appropriate.

28   [4] *See* Plaintiff's Opposition at 7 n.4.

23

United States District Court
For the Northern District of California

**C. Claim Two: Breach of Contract by McCloy**

**1. Whether California Statute of Limitations Bars the Claim**

Defendants argue that PAI's breach of contract claim is barred by California's four-year statute of limitations, Cal. Code Civ. Proc. § 337, pointing to the fact that McCloy was terminated in March 2002 and her claims were filed more than four years later, in August 2006. Plaintiff counters that there is a factual dispute as to whether Tennessee law (under which the statute of limitations is six years, *see* T.C.A. § 28-3-109(a)(3)) applies to this claim and, further, that the claim did not accrue until late 2004, when McCloy allegedly used PAI confidential information in the ISSi proposal for the ES contract.

For the reasons discussed above, the Court concludes that there is no factual dispute as to the applicability of the choice of law provision in the Subcontract but that Tennessee law applies to the breach of contract claims against McCloy. Applying Tennessee's six-year statute of limitations, this claim is timely.

Alternatively, the Court rejects Defendants' statute of limitations argument on the basis that the claim is timely under California law. Defendants' assertion that any breach of contract must have occurred before McCloy's termination is contradicted by both the facts and the law. As noted above, the Trade Secret Agreement prohibited McCloy from disclosing "trade secrets, confidential information, or any other data of PAI" "during *or any time after the termination of the working relationship*" between PAI and McCloy. Do Supp. Opposition Decl., Ex. H. Such survival clauses are routinely enforced and Defendants have failed to offer any reason why the provision here should not be enforced.[5] As this claim is based on McCloy's alleged wrongful disclosure of PAI proprietary information to prepare ISSi's bids for the OSIHM and ES Contracts, as well as her use of PAI

---

[5] In their Reply, Defendants argue as to Claim Two that "PAI's Opposition fails to establish that McCloy breached her *Employment Agreement* with PAI." Reply at 7 (emphasis in original). In particular, Defendants assert that the only two agreements that set forth the terms of McCloy's employment are the March 4, 2000 offer letter and the March 20, 2000 acceptance letter. Whether McCloy breached her *employment agreement* is beside the point. Claim Two asserts a breach of contract claim against McCloy based on not only her employment agreement but also the Confidentiality Agreements and the Trade Secrets Agreement. Complaint, ¶ 123.

24

1 proprietary information to solicit PAI employees, both of which allegedly occurred in 2004, the

2 breach of this obligation accrued within four years of the filing of the Complaint.[6]

3 Even if the claim accrued in 2002, based on McCloy's alleged failure to return confidential

4 information and documents, the Court concludes that the claim would be timely under California's

5 discovery rule. Under California law, a claim for breach of contract accrues when the plaintiff

6 discovers, or could have discovered through reasonable diligence, the injury and its cause. *April*

7 *Enters., Inc. v. KTTV,* 147 Cal. App. 3d 805, 827-28 (1983). Thus, in *April Enterprises*, the court

8 held that where a contract between a television producer and a television station prohibited erasure of

9 certain video tapes, a cause of action for breach of contract claim did not accrue at the time the tapes

10 were actually erased but rather, many years later, when the television producer learned the tapes had

11 been erased. *Id.* Here, the earliest PAI could reasonably have discovered the alleged injury was in

12 August 2004, when McCloy allegedly used PAI's proprietary information in its ES proposal.

13 Therefore, even assuming California's four-year statute of limitations applies to this claim, the

14 statute of limitations did not begin to run until August 2004 and the claim is, therefore, timely.

15 For the reasons stated above, Defendants are not entitled to summary judgment on Claim

16 Two on the basis of the California statute of limitations.

17 **2.      Whether there is Evidence of a Breach**

18 Defendants argue that there is no evidence that McCloy breached any of the Confidentiality

19 Agreements or the Trade Secrets Agreement, citing to McCloy's own declaration stating that she

20 returned all confidential PAI documents to PAI and that she did not use PAI's 1999 OSIHMES

21 contract proposal – which she concedes was retained in ISSi's files – in preparing the ES and

22 OSIHM contract proposals. In light of the similarities identified by PAI between the OSIHMES

23 proposals and ISSi's later proposals, which PAI argues show that McCloy did, in fact, rely on the

24 OSIHMES proposal in preparing ISSi's proposals, the Court finds that there is a material issue of

25 fact that precludes summary judgment on this claim.

26

27 <sup>6</sup>      Because the Trade Secret Agreement expressly covers disclosure of PAI confidential information after McCloy's termination, the Court need not address PAI's further argument that McCloy's obligations under the Confidentiality Agreements survive McCloy's termination because those

28 agreements require return of proprietary information upon termination.

25

**D.    Claim Three: Misappropriation of Trade Secrets by McCloy**

Defendants argue that this claim fails because there is no evidence that McCloy violated the Trade Secrets Agreement. For the reasons stated above, the Court concludes that there are factual issues as to this claim.

**E.    Claim Four: Breach of Contract by ISSi[7]**

**1.    Whether Tennessee or California Law Applies to Section 4.7**

PAI seeks summary judgment on Claim Four (and various underlying issues) on the basis of Tennessee law, arguing that the choice of law provision in the Subcontract should be enforced with respect to Section 4.7 of the Subcontract, which limits Defendants' right to solicit PAI employees and offer them employment. Defendants, on the other hand, argue that California law should be applied because application of Tennessee law to Section 4.7 of the Subcontract would violate a fundamental policy of California, and California has a materially greater interest in application of its law than does Tennessee. *See Nedlloyd*, 3 Cal. 4th at 466. The Court concludes that application of Tennessee law to Section 4.7 does not violate a fundamental policy of California to the extent that section prohibits solicitation but *does* violate California public policy to the extent it prohibits Defendants from *offering* employment to PAI employees. Therefore, the Court applies Tennessee law *except* as to the prohibition on offering employment to PAI employees.

Under Tennessee law, "restrictive covenants in employment contracts will be enforced if they are reasonable under the particular circumstances." *Cent. Adjustment Bureau, Inc. v. Ingram*, 678 S.W. 2d 28, 32 (1984). In contrast, California courts have held that, with limited exceptions, "a covenant prohibiting a California employee from working for a competitor after termination of his or her employment violates [California Business and Professions Code] section 16600." On the basis

---

[7] PAI did not respond to Defendants' assertion that to the extent Claim Four is based on the Teaming Agreement, that claim fails as a matter of law. The Court concludes that Defendants are correct: the Teaming Agreement terminated on March 6, 2000, when the Subcontract was signed. The confidentiality obligations created under the Teaming Agreement expired on May 10, 2002, three years after the agreement was executed (see above). PAI has not pointed to any evidence of a breach of the Teaming Agreement that occurred while the obligations created under that agreement were still in effect. Therefore, summary judgment in favor of Defendants is GRANTED to the extent that Claim Four is based on the Teaming Agreement.

26

1  of this conflict, Defendants argue that enforcement of Section 4.7 violates California's fundamental

2  public policy.

3      In resolving this issue, the Court notes that Section 4.7 does not directly limit an employee's

4  right to engage in the employment of her choice as do provisions that are routinely struck down by

5  California courts. Rather, it limits the rights of Defendant ISSi to "solicit or offer work or

6  employment" to PAI employees. In particular, under PAI's interpretation of the provision, it

7  prohibits ISSi, during the period of March 6, 2000, to March 5, 2005, (the term of the Subcontract)

8  from soliciting resumes or professional background information for prospective employment from

9  PAI employees who interacted with ISSi employees in connection with performance of the

10 Subcontract or to offer employment to such employees. Defendants do not dispute that such a

11 provision would be enforceable under Tennessee law, and for the purposes of this analysis, the Court

12 assumes that it would. The question before the Court, then, is whether such a provision violates

13 California's fundamental public policy.

14     The California Court of Appeal's decision in *Loral v. Moyes*, 174 Cal. App. 3d 268 (1985) is

15 instructive. In that case, the defendant, Robert Moyes, was a former employee of TerraCom, a

16 subsidiary of Plaintiff Loral Corporation, who signed a termination agreement that included the

17 following provision.

18         As a condition for the foregoing payments, you will preserve the
           confidentiality of all trade secrets and other confidential information of
19         Loral Corporation, Cronic Corporation and its TerraCom Division and
           you will not now or in the future disrupt, damage, impair or interfere
20         with the business of Cronic Corporation, or its TerraCom Division
           whether by way of interfering with or raiding its employees, disrupting
21         its relationships with customers, agents, representatives or vendors or
           otherwise. You are not however, restricted from being employed by or
22         engaged in a competing business.

23 *Id.* at 274. Subsequently, Moyes accepted employment with a competitor and offered employment

24 with his new employer to two key employees of TerraCom. *Id.* Loral sued Moyes on the basis that

25 he had breached his contractual agreement not to "raid" his former employers employees and Moyes

26 defended on the basis of Section16600 of the California Business and Professions Code. *Id.*

27 Although the trial court found the provision to be void under California law, the court of appeals

28 disagreed.

For the Northern District of California
United States District Court

1      Looking to California cases upholding contractual provisions limiting an individual's right to

2  solicit a former employer's customers or disclose its confidential information, the court of appeal

3  concluded that a limitation on an individual's right to "raid" a former employer's employees was no

4  more significant a restraint on trade. *Id*. at 278-79. The court also noted that the California

5  legislature "has allowed business sellers to promise noncompetition to their buyers without time

6  limitation other than for the period 'so long as the buyer, or any other person deriving title to the

7  goodwill or shares from him, carries on a like business therein.'" *Id*. at 279 (citing Cal. Bus. & Prof.

8  Code § 16601). Thus, the court reasoned, the question to be considered in determining whether such

9  provisions were enforceable was "the potential impact on trade" and the reasonableness of the

10  provision, "evaluated in terms of the employer, the employee, and the public." *Id*. Applying this

11  approach, the court held that the challenged provision was enforceable, stating as follows:

12          This restriction only slightly affects Cronic employees. They are not
            hampered from seeking employment with Aydin nor from contacting
13          Moyes. All they lose is the option of being contacted by him first. It
            does not restrain them from being employed by Aydin, contrary to
14          defendant's argument. Equity will not enjoin a former employee from
            receiving and considering applications from employees of his former
15          employer, even though the circumstances be such that he should be
            enjoined from soliciting their applications.
16
            The restriction presumably was sought by plaintiffs in order to
17          maintain a stable work force and enable the employer to remain in
            business. This restriction has the apparent impact of limiting Moyes'
18          business practices in a small way in order to promote Cronic's
            business. This noninterference agreement has no overall negative
19          impact on trade or business.

20  *Id*. at 280-81.

21      Applying the reasoning of *Loral*, the Court concludes that Section 4.7 is reasonable to the

22  extent it prohibits *solicitation* by Defendants, but that it violates California public policy to the

23  extent it prohibits Defendants from offering employment to PAI employees. In particular, the former

24  limitation, like the provision in *Loral*, only limits Defendants' right to approach PAI employees first.

25  The latter prohibition, though, creates a blanket prohibition under which ISSi may not offer

26  employment to PAI employees *at all*. Therefore, unlike the employees in *Loral*, PAI employees

27  who, on their own initiative, seek employment with ISSi are barred from receiving an offer of

28  employment with ISSi. As a result, this prohibition gives rise to the same result as would a provision

28

in a PAI employee's employment agreement barring that employee from accepting an offer of employment with ISSi. Therefore, the Court concludes that to the extent Section 4.7 prohibits Issi from offering employment to PAI employees, Tennessee law may not be applied.

This conclusion finds support in *VL Systems, Inc. v. Unisen*, 152 Cal. App. 4th 708 (2007). In that case, a computer consulting company, VLS Systems, entered into a contract with client Star Trac to provide assistance to Star Trac as it migrated to a new computer server. *Id.* at 710. The parties entered into a contract under which Star Trac agreed that it would not hire or offer employment to VLS consultants during the term of the agreement or 12 months thereafter. *Id.* The court concluded that this limitation was overly broad and void under California public policy. *Id.* at 713. In a footnote, however, the court noted that its holding was limited to the specific provision at issue in that case. *Id.* at 713 n.4. The court continued, "[p]erhaps a more narrowly drawn clause limited to *soliciting* employees who had actually performed work for the client might pass muster." *Id.* (emphasis in original).

*Application Group, Inc. v. Hunter Group, Inc.*, 61 Cal. App. 4th 881 (1998), cited by Defendants, is also consistent with the Court's result. In that case, the court addressed a provision in an employment contract prohibiting an employee from working for a competitor after his termination. *Id.* at 887. As such, it was undisputed that the provision would have been void as to a California employee. *Id.* at 895. Rather, the question addressed by the court was whether it was void as to a non-California employee who accepted employment with a California competitor. *Id.* at 896. To the extent that *Application Group* stands for the proposition that provisions limiting an employee's right to obtain employment from another employer are void as against public policy, the Court's conclusion regarding Section 4.7 is consistent with that principle. On the other hand, nothing in *Application Group* suggests to the Court that reasoning of *Loral* should not be applied as to the prohibition on solicitation.

The Court rejects Defendants' assertion that Section 4.7 *as a whole* violates public policy because it inhibits competition between contractors bidding for a government contract. Defendants cite to cases holding that agreements between contractors that one will not bid on a government contract have been held to be void. *Seee Swan v. Chorpenning*, 20 Cal. 182 (1862); *Hoffman v.*

29

1 *McMullen*, 83 F. 372 (9th Cir. 1897). However, that is not the situation here. Section 4.7 does not
2 prohibit ISSi from competing for the ES or OSIHM contracts and therefore, these cases are not on
3 point.

4    Accordingly, the Court concludes that Tennessee law may be applied to Section 4.7 *except* as
5 to the prohibition on offering employment to PAI employees.

6                      **2.    Whether PAI is Entitled to Summary Judgment with Respect to Discrete**
7                              **Issues Related to Claim Four**

8    Plaintiff asserts that the meaning of Section 4.7 is clear and that based on the undisputed
9 facts, the Court should find, as a matter of law, that Defendants breached their obligation under that
10 provision. PAI further argues that the Court should find, as a matter of law, that the breach was
11 wilful and that it was the proximate cause of damages to PAI. Defendants argue that Section 4.7 is
12 ambiguous and that determination of the intent of the parties is a question of fact. Defendants further
13 assert that Plaintiff's are not entitled to summary judgment as to either wilfulness or causation. The
14 Court finds that Section 4.7 is clear on its face with respect to the prohibition on solicitation and
15 further, that the letters to PAI employees sent by Defendants in 2004 constitute solicitation.
16 However, fact questions remain regarding willfulness and causation and therefore, the Court declines
17 to enter summary judgment as to the claim as a whole.

18                              **a.    Whether Section 4.7 is Ambiguous[8]**

19    Under both Tennessee and California law, the language of a contract is ambiguous when its
20 meaning is susceptible to more than one reasonable interpretation. *Bonastia v. Berman Bros., Inc.*,
21 914 F. Supp. 1533, 1537 (1995); *Wechsler v. Capital Trailer Sales, Inc.*, 220 Cal. App. 252, 264
22 (1963). In that case, parol evidence may be considered regarding "surrounding circumstances and
23 the practical construction of the parties." *Tennessee Consol. Coal Co. v. United Mine Workers of*
24 *America*, 416 F.2d 1192, 1198 (1969); *see also Wolf v. Superior Court*, 114 Cal. App. 4th 1343,

25

26

27        [8]   As discussed above, the Court finds that the prohibition on offering employment to PAI
28 employees is void under California law and therefore, the Court declines to enforce that prohibitions.
Therefore, the Court addresses below only the prohibition on solicitation.

United States District Court
For the Northern District of California

1  1351 (2004). If there is a conflict in the evidence, there is a fact question that precludes summary
2  judgment. *Tennessee Consol.*, 416 F.2d at 1198; *Wolf*, 114 Cal. App. 4th at 1351.

3  Section 4.7 of the Subcontract provides that "[d]uring the period of performance of this
4  subcontract, the Subcontractor agrees not to solicit or offer work or employment to any employee of
5  the Company associated with the performance of the subcontract." There appears to be no dispute
6  that the words, "during the period of performance of this subcontract" refer to the period March 6,
7  2000, to March 5, 2005. Further, the Court agrees with Defendants that the word "solicit" is not
8  ambiguous and does not warrant the admission of extrinsic evidence. *See Yoho v. Borg-Warner*
9  *Chemicals*, 185 W. Va. 265, 268 (1991). Finally, the Court finds that the qualifying phrase
10 "associated with the performance of this subcontract" obviously refers to which employees cannot be
11 solicited (as PAI argues) and not to the type of work ISSi may offer PAI employees (as ISSi argues).
12 ISSi's proposed interpretation would require the Court to accept a tortured reading of the language of
13 the provision. Therefore, the Court concludes that Section 4.7 prohibits solicitation whatsoever of
14 any PAI employees who was working on the Subcontract.

15 ISSi asserts that PAI is not entitled to summary judgment regarding the meaning of Section
16 4.7, however, because there is evidence that Dobson and McCloy both understood the provision only
17 limited their rights as to employment with ISSi on the Subcontract and not as to future contracts. *See*
18 Declaration of Cecelia McCloy in Opposition to Plaintiff's Motion for Summary Adjudication of
19 Issues ("McCloy Opposition Decl."), ¶¶ 12, 15; Declaration of David Dobson in Opposition to
20 Plaintiff's Motion for Summary Adjudication of Issues ("Dobson Opposition Decl."), ¶¶ 4-5, 8.
21 Whether or not McCloy or Dobson *believed* that Section 4.7 applied only to solicitation to work on
22 the Subcontract is of no moment. There is no evidence that at the time the parties entered into the
23 contract these beliefs were ever expressed. In the face of clear language in the contract – as well as
24 an integration clause providing that the Subcontract "constitutes the entire understanding and
25 agreement of and between the parties" – this evidence does not give rise to a fact question regarding
26 the interpretation of this provision.

27 Based on the evidence offered by Defendants, the Court concludes that interpretation of
28 Section 4.7 is unambiguous with respect to solicitation.

31

*United States District Court*
*For the Northern District of California*

1

### b.    Solicitation

2        As noted above. The word "solicitation" is clear on its face. Further, the Court finds that no

3   reasonable juror could find that the October 15, 2004 letter quoted above, which was sent to PAI

4   employees Amy Johnson, Chander Sujan, and Rob Clerk, was not solicitation. In particular, the

5   following language in that letter makes clear that these were solicitations in violation of Section 4.7

6   of the Subcontract:

7               As a quality small business, ISSi will propose as the prime contractor
               for this important bid. If you would like to be considered by ISSi,
8               *please send us your resume in the strictest of confidence*. We look
               forward to hearing from you.
9

10  Do Motion Decl., Exs. D, E & F (emphasis added). On the other hand, it is not clear from the

11  August 16, 2004 letter to Tom Anderson – which extends an offer of employment on behalf of ISSi –

12  that ISSi solicited Anderson (although there is evidence that it may have done so). Rather, that

13  question is one of fact for the jury. Similarly, there is a fact question as to whether ISSi solicited PAI

14  employee Don Daines.

### c.    Causation

15

16        PAI asserts that is clear, as a matter of law, that it would have won the ES Contract but for

17  Defendants' breach of contract and therefore, it is entitled to summary judgment on the question of

18  causation. Defendants argue, on the other hand, that it is a matter of speculation whether PAI would

19  have won that contract. For reasons that will be discussed below in connection with Plaintiff's

20  interference claims, the Court concludes that questions of fact preclude summary judgment on this

21  issue.

### F.    Claims Six Through Nine

22

23                   1.    Whether PAI Can Establish a Conspiracy[9]

24        Claims Six through Nine are asserted against all Defendants and are based, in part, on the

25  allegation that Defendants conspired against PAI. In its brief, PAI describes the conspiracy as

26  follows:

27

28        [9] On these claims, the parties have relied on California law. As no conflict between California
    and Tennessee law has been identified by the parties, the Court applies California law.

32

The conspiracy between McCloy and Dobson/ISSi was to obtain information from PAI for ISSi's benefit to displace PAI as the incumbent contractor on the OSIHMES contract. Specifically, defendant McCloy obtained PAI's 1999 proprietary proposal, kept it after she was terminated even though she was required to return it, acquired confidential employee information, and then later used both the 1999 Proposal and employee information on ISSi's 2004 Proposal after she was terminated to compete against PAI on the same contract she had managed. In her position as Program Manager McCloy was able to obtain for ISSi confidential PAI compensation information and employee information such as home addresses and qualifications. ISSi then used this information to recruit PAI personnel and propose them in its proposal and propose compensation packages that compare favorably to PAI's.

Plaintiff's Opposition at 19. In addition, in the Complaint Plaintiff alleges that "[t]o carry out the conspiracy, Defendants committed fraud, breached the Employment Agreement, Confidentiality Agreements, Agreements on Non-Disclosure of Trade Secrets, and Subcontract, as alleged above." Complaint, ¶¶ 167, 181, 194 & 208.

Defendants challenge these claims on the grounds that: 1) a party to a contract cannot be part of a conspiracy to breach that contract; and 2) Dobson and McCloy cannot conspire with ISSi because ISSi can only act through its employees. With respect to the first argument, the Court finds that although a party to a contract may not be liable in tort for breach of that same contract under a theory of conspiracy, *see Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 514 (1994), that is not the allegation here. Rather, PAI alleges that the conspiracy was to interfere with its contract with NASA ARC, the OSIHMES contract. Therefore, the rule articulated in *Applied Equipment* does not apply. The second question is more difficult.

It is well-established that "'agents and employees of a corporation cannot conspire with their corporate principal or employer where they act in their official capacities on behalf of the corporation and not as individuals for their individual advantage.'" *Black v. Bank of America*, 30 Cal. App. 4th 1, 4 (quoting *Wise v. S. Pac. Co.*, 223 Cal. App. 2d 50, 72 (1963)). An exception has been recognized, however, which has been stated as follows: "When the interests of principal and agents diverge, and the agents at the time of the conspiracy are acting beyond the scope of their authority or for their own benefit rather than that of the principal," they may be legally capable of engaging in a conspiracy. *Pink Supply Corp. v. Hiebert, Inc.,* 788 F. Supp. 1313, 1317 (1986) (cited with approval in *Black v.*

33

1  *Bank of America*, 30 Cal. 4th at 6, n.3). PAI asserts that that exception applies here because
2  McCloy, as a PAI Program Manager, was acting beyond the scope of her authority.

3       The Court rejects PAI's position. In order for the exception to apply, the relevant acts that
4  made up the conspiracy must have occurred while McCloy was employed by PAI as a Program
5  Manager. Yet , as PAI argued strenuously in response to Defendants' statute of limitations
6  arguments, the wrongful conduct that PAI alleges in support of these claims occurred no sooner than
7  2004, well after McCloy was no longer employed by PAI. As such, PAI's argument that McCloy
8  was acting outside the scope of her authority as an ISSi execute is not persuasive. Even if the
9  relevant conduct occurred while McCloy was a program manager, however, the Court concludes that
10  the exception would not apply. On its face, the exception applies where an individual, though
11  employed by a corporation, is acting on her own behalf or on behalf of another entity, making a
12  conspiracy between the corporation and the individual possible. Yet there is no allegation here that
13  McCloy, at the time she was program manager, was acting to benefit PAI or herself rather than to
14  further ISSi's interests. In short, application of the exception makes no sense under the facts here.

15                    **2.    Evidence that there was a Probability of Future Economic
                             Advantage of Which Defendants Were Aware (Claims Eight and
16                            Nine)**

17       Claims Eight and Nine, for interference with prospective economic advantage, are based on
18  the theory that Defendants interfered with PAI's ability to win the ES and OSIHM Contracts.
19  Plaintiff seeks summary judgment on the basis that there was a prospective economic relationship of
20  which Defendants were aware, Defendants engaged in wrongful conduct that interfered with PAI's
21  prospective economic advantage, and Defendants' conduct was the proximate cause of damages to
22  PAI. Defendants, on the other hand, assert, that a claim for interference with prospective economic
23  advantage, as a matter of law, cannot be based on the possibility that the plaintiff will win a contest
24  because the likelihood of winning is too speculative. Defendants further argue that there is no
25  evidence they were aware PAI hoped to win future contracts or that PAI intended to interfere with
26  PAI's chances and that lacks proof that Defendants caused PAI's damages.

27

28

                                        34

**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**a.    Whether a Future Government Contract is too Speculative to Provide a Basis for a Claim for Interference with Prospective Economic Advantage**

Defendants assert that Plaintiff's claims for interference with prospective economic advantage fails on the basis that the likelihood of being awarded a government contract is too speculative to support such a claim. The Court disagrees.

The question of whether a claim may be stated for intentional interference with prospective economic advantage based on the likelihood that the plaintiff would have won a contest is addressed in detail in *Youst v. Longs*, 43 Cal. 3d 64 (1987). In that case, the plaintiff asserted a claim for intentional interference with prospective economic advantage based on the allegation that the defendant had driven his horse into the path of the plaintiff's horse and struck it with a whip, thereby causing the plaintiff to place lower in a race than it otherwise would have. 43 Cal. 3d 64, 67 (1987). The court concluded that the plaintiff, as a matter of law, did not meet the "threshold causation requirement" for stating a claim for interference with prospective economic advantage, namely, "that it is reasonably *probable* that the lost economic advantage would have been realized but for the defendant's interference." *Id.* at 71 (emphasis in original). In reaching this conclusion, the court reviewed existing case law regarding the causation requirement in the context of contests. It noted that "[s]cholarly authority and cases from other jurisdictions agree that an application of the threshold requirement of probable expectancy to the area of contests in general will usually result in a denial of recovery." *Id.* at 74.

The court in *Youst* looked to the comments in the Restatement Second of Torts for guidance in distinguishing between contests that could support a claim for interference with prospective economic advantage and those that could not:

> The Restatement Second of Torts specifically addresses the speculative nature of the outcome of a horserace. The relevant comment is contained in a "Special Note on Liability for Interference With Other Prospective Benefits of a Noncontractual Nature." The comment states that various possible situations may justify liability for interference with prospective economic benefits of a noncommercial character. Special mention is given to "[c]ases in which the plaintiff is wrongfully deprived of the expectancy of winning a race or a contest, when he has had *a substantial certainty or at least a high probability of success.* For example, the plaintiff is entered in a contest for a large cash prize to be awarded to the person who, during a given time limit, obtains the largest number of subscriptions to a magazine. At a time

1
2
3
4
5

> when the contest has one week more to run and the plaintiff is leading all other competitors by a margin of two to one, the defendant unjustifiably strikes the plaintiff out of the contest and rules him ineligible. In such a case there may be sufficient certainty established so that the plaintiff may successfully maintain an action for loss of the prospective benefits. On the other hand, if the plaintiff has a horse entered in a race and the defendant wrongfully prevents him from running, there may well not be sufficient certainty to entitle the plaintiff to recover.

6  *Id.* at 76 (citing Rest. 2d Torts, § 774B, special note, pp. 59-60).

7        The California Supreme Court in *Youst* relied, in part, on its earlier decision in *Blank v.*

8  *Kirwan*, 39 Cal. 3d 311 (1985). In that case, the plaintiff had applied to the city council for a license

9  to operate a poker club. *Id.* at 1370. After the city council denied his application, he sued the city

10  council and various public and private individuals, alleging that they intentionally interfered with his

11  prospective economic advantage by conspiring to legalize poker clubs and, through the sharing of

12  inside information and adoption of certain zoning restrictions, afford a monopoly to the individual

13  defendants. *Id.* at 1319. The court held that the plaintiff's claim failed for two reasons. First, it held

14  that the plaintiff's relationship was not an "economic relationship," noting that the economic

15  relationship would have been between the plaintiff and his future patrons. *Id.* at 330. Second, the

16  court held that plaintiff did not have any "reasonable expectation of economic advantage,"

17  explaining as follows:

18
19
20
21
22

> The tort has traditionally protected the expectancies involved in ordinary commercial dealings - not the "expectancies," whatever they may be, involved in the governmental licensing process. (See Prosser & Keeton, The Law of Torts (5th ed. 1984) § 130, p. 1006.) Plaintiff does not attempt to justify such an expansion of the tort. Nor would he likely have been successful if he had. Under Ordinance No. 806 the city council's discretion to grant or deny an application for a poker club license is so broad as to negate the existence of the requisite "expectancy" as a matter of law.

23  *Id.*

24        In *Korea Supply Co. v. Lockheed Martin*, 29 Cal. 4th 1134 (2003), the California Supreme

25  Court allowed a claim for interference with prospective economic relations to proceed under facts

26  that are somewhat similar to those at issue here. In that case, the government of Korea had solicited

27  competing bids from manufacturers for the purchase of military equipment. *Id.* at 1140. The

28  plaintiff represented MacDonald Dettwiler in the negotiations related to the contract and was to

36

1  receive a commission if the contract was won. *Id.* Defendant Loral (which became Lockheed
2  Martin) was awarded the contract, allegedly because Loral and its agents had offered bribes and
3  sexual favors to key Korean officials. *Id.* The court noted that the tort "'protects the expectation that
4  the relationship eventually will yield the desired benefit, not necessarily the more speculative
5  expectation that a potentially beneficial relationship will arise.'" *Id.* at 1164 (quoting *Westside*
6  *Center Assocs. v. Safeway Stores 23, Inc.*, 42 Cal. App. 4th 507, 524 (1996)). It went on to hold that
7  this requirement was met because the plaintiff would have received a commission if the contract had
8  been awarded to MacDonald Dettwiler and "[t]his business relationship was sufficient to meet
9  this . . . element." *Id.*

10  Here, PAI has alleged that there was a strong probability that as the incumbent contractor, it
11  would have been awarded the ES Contract if ISSi had not solicited key personnel for its own
12  proposal, and used proprietary information obtained from PAI to bolster its proposal. As a result of
13  Defendants' activities, PAI argues, PAI came in second in the competition instead of winning the ES
14  Contract. In light of the case law discussed above, the Court concludes that Plaintiff has established
15  a reasonable probability of a future economic relationship sufficient to proceed on this claim.
16  Plaintiff's theory is not so speculative as the horse race at issue in *Youst.* Nor does the government
17  bidding process at issue here appear to involve the broad discretion that the court cited in *Blank.*
18  Rather, NASA has articulated detailed criteria for awarding government contract and those criteria
19  show that the key personnel listed in a proposal are an important factor in the contract award. As in
20  *Korea Supply*, this is sufficient to demonstrate a probable future economic benefit.

21                                    **b.       Intent Requirement**

22  In order to establish intent for the purposes of a claim of interference with prospective
23  economic relations, a plaintiff must demonstrate that the defendant "'knew that the interference is
24  certain or substantially certain to occur as the result of his action.'" *Korea Supply*, 29 Cal. 4th at
25  1157 (quoting Rest. 2d Torts, §766B). Generally, intent is a question of fact. *Id.* at 1157 n.9. While
26  PAI argues that it has met this requirement as a matter of law and Defendants assert PAI has failed to
27  meet this requirement as a matter of law, the Court concludes that there is factual dispute on this
28  question that cannot be resolved on summary judgment.

*United States District Court*
*For the Northern District of California*

United States District Court
For the Northern District of California

1

## c. Evidence of Causation

2   Both PAI and ISSi seek summary judgment on the question of causation: PAI argues that it is
3   clear that it would have won the ES Contract if ISSi had not won it and, therefore, that it has
4   established causation as a matter of law; ISSi argues that the likelihood that PAI would have won the
5   contract is merely speculative. For the reasons stated above, the Court concludes that the question of
6   causation is not speculative. On the other hand, PAI has not cited any authority that suggests to the
7   Court that summary judgment in its favor is appropriate under the facts here. Rather, the question of
8   causation is one that involves factual issues for the jury to decide.

9

## G. Claims Ten and Eleven: Interference with Employment Agreements

10   In Claims Ten and Eleven, Plaintiffs allege that Defendants induced PAI employees to breach
11   "verbal or written" employment agreements. Defendants assert that they are entitled to summary
12   judgment on this claim because there is no evidence that any employee breached an employment
13   agreement. The Court agrees.

14   PAI points to (undisputed) evidence that Tom Anderson, while working for PAI, agreed to be
15   listed as a key employee for ISSi if it won the ES Contract and in addition, revealed his salary to ISSi
16   in the context of discussions with ISSi about what salary he would require to commit to working for
17   ISSi in the future. Yet the only contractual agreement of which there is any evidence in the record is
18   the Trade Secrets Agreement. That agreement does not expressly refer to an employee's salary and
19   benefits information, and Plaintiff has cited no authority that a prohibition on sharing an employer's
20   confidential or proprietary information should be interpreted as prohibiting the employee from
21   sharing his *own* salary and benefit information with a prospective employer. Indeed, such a
22   provision would likely be void under California law. Therefore, Defendants are entitled to summary
23   judgment on these claims.[10]

24

25   [10] PAI has asked to amend its complaint to add claims for Intentional and Negligent Interference
26   with Prospective Economic Advantage to keep solicited employees. Plaintiff's Opposition at 23 n.12.
At this late stage of the case, the Court declines to permit such an amendment and notes that PAI has
offered no reason for failing to assert this claim earlier in the case. It is apparent that the only reason for
27   seeking to amend at this stage is Plaintiff's desire to avoid summary judgment. *See Oncology
Therapeutics Network Connection v. Virginia Hematology Oncology PLLC*, 2006 WL 334532 (N.D.
28   Cal. Feb. 10, 2006) (concluding that under Ninth Circuit law, the district court may in exercising its

38

1

**H.     Claim Twelve: Unfair Competition Under § 17200**

2          Defendants assert that Plaintiff's claim for unfair competition under Section 17200 fails
3   because the acts alleged do not rise to the level of violation of antitrust laws or policies and do not
4   threaten competition. Plaintiff counters that Defendants' acts rise to the level of unfair competition
5   and further, that it can establish a violation of Section 17200 based on the theory that Defendants'
6   conduct was "unlawful" rather than "unfair." The Court concludes that Defendants are not entitled
7   to summary judgment on this claim.

8          It is well-established that Section 17200 "'establishes three varieties of unfair competition –
9   acts or practices which are unlawful, or unfair, or fraudulent.'" *Cel-Tech Commc'ns, Inc. v. Los*
10  *Angeles Cellular*, 20 Cal. 4th 163, 180 (1990) (quoting *Podolsky v. First Healthcare Corp.*, 50 Cal.
11  App. 4th 632, 647 (1996)). As noted in *Courtesy Temporary Services, Inc. v. Camacho*, 222 Cal.
12  App. 3d 1278, 1292 (1990), "[t]he cases are legion holding that a former employee's use of
13  confidential information obtained from his former employer to compete with him and to solicit the
14  business of his former employer's customers, is regarded as unfair competition." In any event,
15  Plaintiff may be able to prevail on this claim on the basis that Defendants have engaged in unlawful
16  conduct. Therefore, Defendants are not entitled to summary judgment on this claim.

17  **IV.     CONCLUSION**

18         For the reasons stated above, Plaintiff's Motion is GRANTED IN PART and DENIED IN
19  PART and Defendants' Motion is GRANTED IN PART and DENIED IN PART. In particular, the
20  Court holds as follows:

21  Claim One: Defendants' request for summary judgment is DENIED.

22  Claim Two: Defendants' request for summary judgment is DENIED.

23  Claim Three:  Defendants' request for summary judgment is DENIED.

24  Claim Four: Defendants' request for summary judgment that the claim fails to the extent it is based
25  on the Teaming Agreement is GRANTED. Plaintiff's request for summary judgment is GRANTED
26  IN PART: the Court holds that the choice of law provision in the Subcontract is enforceable as to

27

28  discretion with respect to a motion to amend consider whether a summary judgment motion is pending
    and citing *Ferris v. Santa Clara County*, 891 F.2d 715 (9th Cir. 1989)).

United States District Court
For the Northern District of California

39

1   Section 4.7 of the Subcontract except to the extent that Section 4.7 prohibits ISSi from offering

2   employment to PAI employees; further, that Section 4.7 prohibits solicitation of PAI employees

3   working on the Subcontract; and further that the October 15, 2004 letter sent to some PAI employees

4   constitutes "solicitation" in violation of Section 4.7. The Court holds that questions of fact remain

5   regarding wilfulness and causation, as well as damages.

6   Claim Six: Defendants' request for summary judgment is GRANTED as to Plaintiff's conspiracy

7   allegations; however, the claim itself survives summary judgment.

8   Claim Seven: Defendants' request for summary judgment is GRANTED as to Plaintiff's conspiracy

9   allegations; however, the claim itself survives summary judgment.

10  Claims Eight & Nine: Defendants' request for summary judgment is GRANTED as to Plaintiff's

11  conspiracy allegations; however, the claim itself survives summary judgment. The Court DENIES

12  Defendants' request for summary judgment on the basis that the likelihood of winning future

13  government contracts is too speculative to support the claim. The Court DENIES Plaintiff's request

14  for summary judgment regarding intent, as well as Plaintiff's and Defendants' request for summary

15  judgment on the questions of causation.

16  Claims Ten & Eleven: Defendants' request for summary judgment on these claims is GRANTED.

17  These claims are dismissed with prejudice.

18  Claim Twelve: Defendants' request for summary judgment on this claim is DENIED.

19      IT IS SO ORDERED.

20

21  Dated: February 13, 2008

22                                                  JOSEPH C. SPERO
                                                    United States Magistrate Judge
23

24

25

26

27

28

40

# UNITED STATES DISTRICT COURT

## FOR THE

## NORTHERN DISTRICT OF CALIFORNIA

PAI CORPORATION,

Plaintiff,

v.

INTEGRATED SCIENCE SOLUTIONS INC
et al,

Defendant.

_____/

Case Number: CV06-05349 JCS

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District
Court, Northern District of California.

That on February 15, 2008, I SERVED a true and correct copy(ies) of the attached, by placing
said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by
depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office
delivery receptacle located in the Clerk's office.

David C. Lee
Fitzgerald Abbot & Beardsley LLP
1221 Broadway
21st Floor
Oakland, CA 94612-1837

Patricia Anne Meagher
Rossi & Meagher LLP
582 Market St., Suite 301
San Francisco, CA 94104

Q. Huy Doan Do
DLC Law Group
222 Kearny Street
7th Floor
San Francisco, CA 94108

William Errol Adams
Fitzgerald, Abbott & Beardsley LLP
1221 Broadway, 21st Floor
Oakland, CA 94612

Dated: February 15, 2008

Karen L. Hom

Richard W. Wieking, Clerk
By: Karen Hom, Deputy Clerk