1

2

3

4

5               UNITED STATES DISTRICT COURT

6               NORTHERN DISTRICT OF CALIFORNIA

7

8   PAI CORPORATION,                          No. C-06-05349 JCS

9           Plaintiff,                        **ORDER RE: 1) DEFENDANTS'**
                                              **RENEWED MOTION FOR JUDGMENT**
10      v.                                    **AS A MATTER OF LAW; AND 2)**
                                              **DEFENDANTS' MOTION FOR A NEW**
11  INTEGRATED SCIENCE SOLUTIONS,             **TRIAL [Docket Nos. 226, 228]**
    INC., ET AL.,

12          Defendants.

13  _____/

14  **I.      INTRODUCTION**

15          Following an eight-day jury trial, a verdict was entered in favor of Plaintiff PAI Corporation

16  ("PAI").  Defendants Integrated Science Solutions, Inc. ("ISSi") and Cecelia McCloy now bring a

17  motion for judgment as a matter of law ("the JMOL Motion") and a motion for a new trial ("the New

18  Trial Motion").  A hearing on the Motions was held on Wednesday, April 8, 2009.  For the reasons

19  stated below, the Motions are GRANTED in part and DENIED in part.[1]

20  **II.     BACKGROUND**

21          **A.      Procedural Background[2]**

22          At trial, the jury was presented with the following claims: 1) Breach of Fiduciary Duty

23  (Defendant McCloy); 2) Breach of Employment Agreement (Defendant McCloy); 3) Breach of

24  Confidentiality Agreements (Defendant McCloy); 4) Breach of Trade Secret Agreement (Defendant

25  _____

26      [1]  The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant
    to 28 U.S.C. § 636(c).

27
        [2]A detailed discussion of the facts of the case can be found in the Court's summary judgment
28  order, filed February 15, 2008 [docket no. 101].

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

McCloy); 5) Breach of Subcontract Agreement (Defendant ISSi); 6) Misappropriation of Trade Secrets (Defendants McCloy and ISSi); 7) Fraud (Defendants McCloy and ISSi); 8) Intentional Interference With Prospective Economic Advantage (Defendants McCloy and ISSi); 9) Negligent Interference With Prospective Economic Advantage (Defendants McCloy and ISSi); and 10) Unfair Competition under Cal. Bus. & Prof. Code §§ 17200 et seq. (Defendants McCloy and ISSi).  In addition, Defendant ISSi presented a counterclaim for Breach of the Subcontract Agreement by PAI.

Following the close of evidence and prior to the commencement of deliberations, Defendants filed a motion for judgment as a matter of law under Rule 50(a) of the Federal Rules of Civil Procedure.  The Court denied that motion except as to two claims that are not at issue here. *See* Trial Transcript at 1051-1058.

The jury found in favor of Plaintiff with respect to the following claims:  1) Breach of Fiduciary Duty (Defendant McCloy); 2)  Breach of Employment Agreement (Defendant McCloy); 3) Breach of Confidentiality Agreements (Defendant McCloy); 4) Breach of Subcontract (Defendant ISSi); 5) Intentional Interference With Prospective Economic Advantage (Defendants McCloy and ISSi); 6)  Unfair Competition under Cal. Bus. & Prof. Code §§ 17200 et seq. (Defendants McCloy and ISSi).  The jury found in favor of Defendants on Plaintiff's claims for: 1) Breach of Trade Secrets Agreement (Defendant McCloy); 2)  Misappropriation of Trade Secrets (Defendants McCloy and ISSi); 3) Fraud (Defendants McCloy and ISSi); and 4) Negligent Interference with Prospective Economic Advantage (Defendants McCloy and ISSi).  The jury awarded PAI $2,130,845.00 in damages. The jury found that Defendants had not established a breach of the Subcontract Agreement by PAI and awarded no damages on that claim.

Judgment was entered in favor of Plaintiff on November 5, 2008.  Pursuant to stipulation by the parties, Defendants filed their post-trial motions on December 1, 2008.

**B.     The Motions**

      **1.     The JMOL Motion**

In the JMOL Motion, Defendants assert that judgment should be entered in their favor as to the following claims: 1) Breach of Fiduciary Duty (Defendant McCloy); 2)  Breach of Employment Agreement (Defendant McCloy); 3) Breach of Confidentiality Agreements (Defendant McCloy);

United States District Court

For the Northern District of California

1  and 4)  Intentional Interference With Prospective Economic Advantage (Defendants McCloy and

2  ISSi), on the grounds that the evidence was not legally sufficient to support the jury's verdict on

3  these claims.  In the alternative, Defendants request a new trial on these claims on the same grounds.

4  　　Plaintiff asserts that the JMOL Motion is untimely and in any event, that JMOL is not

5  warranted because there was sufficient evidence to support the jury's verdict.

6  　　　　　**2.　　The New Trial Motion**

7  　　Defendants assert that a new trial is necessary because the jury verdict form contains

8  irreconcilable inconsistencies.  In particular, Defendants argue that a new trial is necessary because:

9  1) the jury verdict awards total damages against both defendants, even though certain claims that

10  were found to give rise to liability were not asserted as to both defendants, and the verdict does not

11  break out the damages claim-by-claim; and 2) the jury's finding that Defendants are not liable for

12  fraud or misappropriation of trade secrets is inconsistent with its finding of liability as to the claims

13  for intentional interference with prospective economic advantage and for unfair competition.

14  Finally, Defendants assert that the jury's verdict awarding no damages on its counterclaim is against

15  the overwhelming weight of the evidence.

16  **III.　　ANALYSIS**

17  　　　　**A.　　Whether the Motions are Timely**

18  　　Plaintiff asserts that Defendants' JMOL Motion is untimely, citing cases in which courts

19  have held that the ten-day deadline for filing such motions is jurisdictional and may not be waived

20  by the parties or extended by the court.  *See, e.g., U.S. Leather, Inc. v. H & W Partnership*, 60 F.3d

21  222, 225 (5th Cir. 1995).  These cases rely on Rule 6(b) of the Federal Rules of Civil Procedure,

22  which provides that "[a] court must not extend the time to act under Rules 50(b) and (d), 52(b),

23  59(b), (d), and (e), and 60(b), except as those rules allow."  *See Scott v. Younger*, 739 F.2d 1464,

24  1467 (9th Cir. 1984) (holding that ten-day deadline for filing motion to alter or amend judgment

25  under Rule 59(e) could not be extended because, pursuant to Rule 6(b), the deadline was

26  jurisdictional).  To the extent Rule 6(b) prohibits extension of the ten-day deadline for both JMOL

27  motions under Rule 50(b) and new trial motions under Rule 59(b), Plaintiff's argument applies to

28  both of Defendants' motions.  The Court concludes, however, that the Supreme Court's recent

United States District Court

For the Northern District of California

1    decisions in *Kontrick v. Ryan*, 540 U.S. 443 (2004) and *Eberhart v. United States*, 546 U.S. 12

2    (2005) have effectively overruled the cases that have held that Rule 6(b) renders the 10-day

3    deadlines in Rules 50(b) and 59(b) jurisdictional.  Therefore, the Court finds that the Motions are

4    timely.

5    In *Kontrick*, the Court acknowledged that "[c]ourts, including this Court . . . have been less

6    than meticulous" in using the term "jurisdictional" and cited as an example courts' use of that term

7    to described Federal Rule of Civil Procedure 6(b), on time enlargement.  540 U.S. at 453.  The Court

8    explained that only Congress may determine a federal court's subject-matter jurisdiction and

9    therefore, a federal rule establishing a time limitation is jurisdictional only if it derives from a

10   statute.  *Id*. at 452-453.  Where a time limitation is jurisdictional, it may not be waived.  *Id*.  On the

11   other hand, the Court explained, rules establishing time limitations that do not derive from statute –

12   so-called "claim-processing rules" – do not create or withdraw jurisdiction and therefore may be

13   forfeited where the party asserting the rule waits to raise the point.  *Id*. at 455-456.  Applying this

14   approach, the Court held that the time limitations in Bankruptcy Rules 4004(a) and (b) and

15   9006(b)(3) were not jurisdictional and were forfeited because the party seeking to invoke those rules

16   waited too long to do so.  *Id*.

17   In *Eberhart*, the Court followed the same approach as it had in *Kontrick* to determine

18   whether the time limit for filing a new trial motion under Rules 33 and 45(b) of the Federal Rules of

19   Criminal Procedure was jurisdictional.  546 U.S. at 405.  Pointing to the similarity between the rules

20   at issue in the two cases, the Court concluded that the time limits in *Eberhart* were claim-processing

21   rules rather than jurisdictional rules.  *Id*.  The Court further held that the rules had been forfeited

22   because they were not raised in a timely manner.  *Id*.

23   Before *Kontrick* and *Eberhart* were decided, the Ninth Circuit held, without discussion, that

24   the time limit for filing motions under Rule 59(e) of the Federal Rules of Civil Procedure is

25   jurisdictional.  *See Harman v. Harper,* 7 F.3d 1455, 1458 (9th Cir. 1993); *Carter v. U.S.*, 973 F.2d

26   1479, 1488 (9th Cir. 1992).  To the extent these cases were based on the theory that Rule 6(b) renders

27   jurisdictional the ten-day deadline contained in Rule 59(e), they indicate that under existing Ninth

28   Circuit authority, the ten-day deadlines in Rules 50(b) and 59(b) are also jurisdictional.  This

**United States District Court**
For the Northern District of California

conclusion, however, is clearly irreconcilable with the approach set forth in *Kontrick* and *Eberhart* and therefore, the Court declines to follow this earlier precedent.  *See Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (holding that where the issues decided by the Supreme Court "undercut the theory or reasoning underlying the prior circuit precedent in such a way as the cases are clearly irreconcilable," the Supreme Court's decision is controlling).

Although the Ninth Circuit recently acknowledged the framework set forth in *Kontrick* and *Eberhart*, *see United States v. Comprehensive Drug Testing, Inc.*, 513 F.3d 1085 (9th Cir. 2008), it has not addressed the specific question of whether Rule 6(b) renders the deadlines in Rules 50(b) and 59(b) jurisdictional in the wake of those cases.   The Sixth Circuit has addressed this precise question, however, in *Dill v. General American Life Insurance Company*, 525 F.3d 612 (6th Cir. 2008).  In that case, the court reasoned as follows:

> Federal Rule of Civil Procedure 6(b)(2), at issue in this case, states that "[a] court must not extend the time to act under Rules 50(b) and (d), 52(b), 59(b), (d), and (e), and 60(b), except as those rules allow."  This language is virtually identical to the language of Criminal Procedure Rule 45(b)(2) at issue in *Eberhart* and Bankruptcy Rule 9006(b)(3) at issue in *Kontrick*. Further, Criminal Procedure Rule 45(b), at issue in *Eberhart*, and Bankruptcy Rule 9006(b), at issue in *Kontrick*, were both "modeled on Federal Rule of Civil Procedure 6(b)." . . . Moreover, Rule 50(b), like the rules in *Kontrick* and *Eberhart*, does not provide an exception to the time requirements stated within that rule. Fed.R.Civ.P. 50(b).

> Because the time limitation provisions in Rules 6(b)(2) and 50(b) here, are virtually identical to the provisions at issue in *Kontrick* and *Eberhart*, we conclude that Federal Rules of Civil Procedure 6(b)(2) and 50(b) are nonjurisdictional claim-processing rules. . . . Because of the similarities between these rules and those at issue in *Kontrick* and *Eberhart*, it would be "implausible" to rule otherwise.

*Id.* at 618 (citations omitted).

This Court finds the reasoning of *Dill* to be persuasive and for the reasons articulated in that case concludes that the ten-day limit under Rules 50(b), 59(b) and 6(b) is a claim-processing rule that may be forfeited.  To the extent that cases decided by the Ninth Circuit before *Kontrick* and *Eberhart* suggest a contrary result, the Court concludes that these cases have been overruled by the Supreme Court.  The Court further finds that the rule *was*, in fact, forfeited by Plaintiff.  In particular, immediately following the trial, and before the ten-day period had expired, Plaintiff expressly stipulated to an extension of the deadline to file post-trial motions.  *See* Docket Nos. 217, 221.  It was not until Plaintiff filed its opposition to the JMOL Motion that Plaintiff first objected to

United States District Court

For the Northern District of California

1  the motion as untimely.  By misleading Defendants into waiting to file their motions, and then

2  waiting until *after* the ten-day period had expired to raise its Rule 6(b) defense, Plaintiff forfeited

3  that defense.

4      Accordingly, the Court rejects Plaintiff's assertion that the JMOL Motion is barred on

5  jurisdictional grounds because it was filed more than ten days after judgment was entered.  Rather,

6  the Court finds that both the JMOL Motion and the New Trial Motion are timely.

7      **B.**    **Legal Standard Applicable to JMOL Motions**

8      Pursuant to Rule 50 of the Federal Rules of Civil Procedure, a court may grant a motion for

9  judgment as a matter of law ("JMOL") against a party on a claim or issue where the party has been

10  "fully heard on [that] issue during a jury trial" and the court finds that a "reasonable jury would not

11  have a legally sufficient evidentiary basis" to find for that party.  Fed. R. Civ. P. 50(a) & (b).  Where

12  a party moves for JMOL in a case that has been tried to a jury, the court must determine whether

13  "there exists evidence of record upon which a jury might properly have returned a verdict in [the

14  non-movant's] favor when the correct legal standard is applied."  *Markman v. Westview Instruments,*

15  *Inc.*, 52 F.3d 967, 975 (Fed. Cir. 1995) (quoting *Jamesbury Corp. v. Litton Indus. Prods., Inc.,*, 756

16  F.2d 1556, 1560 (Fed. Cir. 1985) (emphasis added in *Markman*)).  "In ruling on a motion for JMOL,

17  'the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make

18  credibility determinations or weigh the evidence.'"  *City Solutions, Inc. v. Clear Channel*

19  *Communications*, 365 F.3d 835, 840 (9th Cir. 2004)(quoting *Reeves v. Sanderson Plumbing*

20  *Products, Inc.*, 530 U.S. 133, 150 (2000));  *see also White v. Ford Motor Co.*, 312 F.3d 998, 1010

21  (9th Cir. 2002)(holding that on a Rule 50 motion, "[t]he test is whether the evidence, construed in the

22  light most favorable to the nonmoving party, permits only one reasonable conclusion, and that

23  conclusion is contrary to that of the jury").

24      Where a court grants a motion for JMOL under Rule 50(b), "it must also conditionally rule

25  on any motion for a new trial by determining whether a new trial should be granted if the judgment

26  is later vacated or reversed."  Fed. R. Civ. P. 50(c).

27

28

**United States District Court**
For the Northern District of California

**C.     Legal Standard for New Trial Motions**

Even where the court finds that JMOL is not appropriate, it may order a new trial under Rule 59 of the Federal Rules of Civil Procedure.  Rule 59 provides that a court may, following a jury trial, order a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed.R.Civ.P. 59(a)(1)(A).  "Historically recognized grounds include but are not limited to 'claims that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving.'" *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007)(quoting *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940)).

The Ninth Circuit has held that a new trial may be granted "'only if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice.'" *Id.* (quoting *Passantino v. Johnson & Johnson Consumer Prods.*, 212 F.3d 493, 510 n.15 (9th Cir. 2000)).  In contrast to JMOL motions, in determining whether a verdict is contrary to the clear weight of the evidence, the court  "has 'the duty . . . to weigh the evidence as [the court] saw it'" and may set aside the verdict even if it is supported by substantial evidence.  *Id.* (quoting *Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990)).

An award of damages may be set aside where it is "'grossly excessive or monstrous, clearly not supported by the evidence or based only on speculation or guesswork.'" *DSU Medical Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1309 (9th Cir. 2006).

**D.     Whether Defendants are Entitled to JMOL or a New Trial**

Defendants assert that they are entitled to JMOL, or in the alternative, a new trial, with respect to specific claims as to which the jury found liability.  They also assert in their New Trial Motion that the Court should grant an entirely new trial based on what they assert are inconsistencies in the verdict.  At a minimum, Defendants assert, a new trial on damages is required. The Court addresses Defendants' arguments claim-by-claim and then turns to the alleged shortcomings in the verdict that Defendants assert require an entirely new trial.

United States District Court

For the Northern District of California

1          **1.      Breach of Fiduciary Duty Claim (Defendant McCloy)**

2                  **a.      Background**

3          Defendants argue that no reasonable jury could have found that McCloy breached her

4  fiduciary duty to PAI because there was no evidence that McCloy breached a fiduciary duty by: 1)

5  failing to work 40 hours/week as a program manager; 2) failing to avoid organizational conflicts of

6  interest by acting as PAI's program manager; 3) neglecting to safeguard PAI's relationship with

7  NASA/ARC; 4) competing (via ISSi) against PAI for the ES and OSIHM contracts; 5) disparaging

8  PAI; and 6) giving preference to ISSi's employees.

9          Plaintiff asserts that there was sufficient evidence in the record for the jury to conclude that

10  McCloy breached her fiduciary duty to PAI, pointing in particular to evidence that McCloy "reneged

11  on her preappointment commitment to: 1) not serve as ISSi's president so she could function,

12  without conflict, as PAI's program manager at the NASA/ARC jobsite; and 2) work full time (i.e. 40

13  hours a week) at the site."  Opposition at 5.  Plaintiff also asserts that the jury's finding was

14  supported by evidence that "McCloy favored ISSi's employees over PAI's employees, that McCloy

15  failed to perform work expected by the client, that McCloy solicited PAI's employees to defect to

16  ISSi, and that McCloy worked to steer business away from PAI toward her own company, ISSi."

17  Opposition at 8.

18                  **b.      Analysis**

19          In order to prove its claim for breach of fiduciary duty, Plaintiff was required to demonstrate,

20  by a preponderance of the evidence, that: 1) McCloy owed a fiduciary duty to PAI ; 2) she breached

21  that duty; and 3) the breach caused PAI harm.  Jury Instruction No. 43.   A breach of fiduciary duty

22  may be established where a corporate officer breaches her duty of loyalty or due care to the

23  corporation.  Jury Instruction 44; *see also Professional Hockey Corp. v. World Hockey Assn.*,  143

24  Cal.App.3d 410, 414 (1983) ("the duty of loyalty requires the directors . . . not to act in their own

25  self interest when the interest of their corporation will be damaged thereby").  Defendants do not

26  dispute that there was sufficient evidence to establish that when McCloy was a PAI program

27  manager, she owed a fiduciary duty to PAI.  Rather, they assert that the evidence was insufficient, as

28  a matter of law, to establish a breach of that duty by McCloy.  The Court agrees.

                        **i.**          **Evidence that McCloy reneged on pre-employment commitment to resign as president of ISSi and work 40 hours/week for PAI**

PAI's primary theory in support of the Breach of Fiduciary Duty Claim is that McCloy reneged on her pre-appointment commitment to: 1)  resign from her position as president of ISSi and 2) work full-time, meaning 40 hours/week, at the NASA/ARC site, if PAI was awarded the OSIHMES contract.  To establish that McCloy made such a commitment, PAI points to the following documentary evidence:

         1)        The May 1999 PAI-ISSi Teaming Agreement (Exhibit 661);

         2)        David Dobson's June 24, 1999 Letter to Dr. Phung (Exhibit 103.2);

         3)        PAI's July 1999 OSIHMES proposal to NASA (Exhibit 10);

         4)        The March 2000 PAI/ISSi Subcontract (Exhibit 657);

         5)        PAI's Program Procedural Manual (Exhibit 192);

         6)        PAI's Employment Manuals (Exhibits 88.3-10, 185, 195 and 713).

In addition, PAI points to testimony by PAI's president,  Dr. Phung, in which he purportedly testified that he only agreed to enter into the subcontract with ISSi based on representations by McCloy and ISSi that McCloy would give up her position with ISSi and work full-time for PAI.

Defendants assert that the documentary evidence shows that McCloy and PAI both understood when McCloy accepted the position of program manager that McCloy would continue to hold her position as president of ISSi and would work four 10-hour days a week (including commute time) rather than five 8-hour days, citing to the acceptance letter that McCloy sent Dr. Phung when she signed PAI's offer of employment, as well as other paperwork McCloy submitted to PAI at the outset of her employment.  *See* Exhibit 88, PAI211-023, PAI 211-024.

Having carefully reviewed the evidence cited by PAI, the Court concludes that there is no evidence to support PAI's assertion that McCloy agreed to give up her job as president of ISSi and work full-time for PAI.  Rather, the evidence compels the conclusion that McCloy did not make any such commitment.  The evidence that was presented to the jury on this question is summarized below.

**United States District Court**

For the Northern District of California

1    In May 1999, PAI and ISSi entered into a Teaming Agreement in which the two corporations

2   agreed that they would work together on a proposal to obtain a NASA contract ("the OSIHMES

3   Contract"), with PAI as proposed prime contractor and ISSi as proposed subcontractor.  Exhibit 661.

4    In the Teaming Agreement, it is stated that "[a]nticipated services [to be provided by ISSi] include

5   identification of Ceil McCloy as Program Manager (as an employee assigned to PAI ) . . . ."  *Id.*,

6   PAI074-002 (Section 3.1).  The Teaming Agreement does not include any details concerning the

7   terms of McCloy's employment as a future PAI program manager.  Further, the Teaming Agreement

8   makes clear that "the subcontract to be entered into between PAI and [ISSi] is subject to prior

9   agreement between the contracting parties for establishing mutually satisfactory terms and

10  conditions . . . ."  *Id.* (Section 2.2).

11   In June 1999, David Dobson, as "principal" of ISSI, sent a letter to PAI's president, Dr.

12  Phung, stating that ISSi was "pleased to team with PAI" on the OSIHMES proposal and that it had

13  "agreed to assign Cecelia McCloy, *a co-principal of ISSi*, to work full-time for the program as

14  Program Manager."  Exhibit 103 (emphasis added).   Dobson's letter was included in the OSIHMES

15  proposal and, consistent with that letter, the proposal identified McCloy as Program Manager.

16  Exhibit 10.  McCloy also signed a statement in the proposal representing that she had "committed to

17  be a key personnel for the project" and would work "full-time" on the program.  *Id*, D0061.  Neither

18  the Dobson letter nor the OSIHMES proposal addressed the specific meaning of the term "full-time"

19  or mentioned resigning from ISSi.

20   After NASA awarded the OSIHMES Contract to PAI, Dr. Phung, sent a letter to McCloy,

21  dated March 4, 2000, stating that she had been appointed as program manager on the OSIHMES

22  contract.  The letter stated as follows:

> Per our agreement, you are appointed Program Manager of the PAI Corporation's contract with NASA Ames Research Center (ARC).  We have bid you for this position, and both you and PAI have made the commitment to ARC to stay for the duration of the contract, or until certain arrangements could be made in the future to the satisfaction of ARC.  Your sponsor at PAI is Dr. Doan L. Phung, PAI's president and CEO.
>
> Your salary is $92,000.00 per annum.  In addition to the standard benefits package of PAI full-time employees, you are accorded additional incentive bonus that the PAI Team has promised to give to key personnel of the contract.  Your incentive bonus is described in the statement that is enclosed herewith.  There is no relocation allowance with *this offer*.

> In accepting *this offer,* you agree to abide by the rules and regulations of the PAI Corporation, of ARC, and of the United States. Since you are also associated with [ISSi] which is a major subcontractor to this contract, you will need to write a conflict of interest avoidance and mitigation statement as soon as you assume you[r] duties, so that all may adhere to its letter and spirit. You additionally agree to manage your duties to the best of your ability, and to communicate with the various PAI responsibles fully and rapidly to resolve any problems as soon as they arise.
>
> *If you agree with the above, please sign below* and return the original of this letter to PAI Human Resources Manager together with the filled out documents that we have enclosed herewith. Your employment starts April 1, 2000, or as soon as the contract is officially implemented.

Exhibit 88.10, PAI211-023 (emphasis added).

McCloy signed the acceptance at the bottom of the letter with the notation "Please see attached letter." *Id.* The attached letter is from McCloy and is addressed to Dr. Phung. *Id.*, PAI211-024. McCloy states, in part, as follows:

> Thank you for your kind offer of employment with PAI Corporation. I am returning to you the signed offer letter, indicating my start with PAI on 3/17/2000. As per our discussions, starting in May I will work on site four 10 hour days Monday through Thursday. Eight hours will be direct charge to NASA the remaining two hours will be on PAI overhead and cover part of my commute. On Fridays, the Technical Manager will be in charge of the program. I am expecting five years of service from the NASA incumbent transfer program.
>
> . . .
>
> As you are aware, I will remain President of ISSi and continue to conduct business and marketing activities for that company. Because of personal Conflict of Interest, I have declined all benefits with PAI including medical, dental, retirement and profit sharing. I also respectfully ask that you not grant me any bonus money from PAI except the potential funds from the Performance Award fee.
>
> I would very much like to preserve our friendship and excellent business relationship so that both PAI and ISSi will continue to expand and grow. I would like to work with you to develop an acceptable Conflict Mitigation Plan. I have some thoughts on this which I hope will be acceptable to both of us.
>
> 1)   Please provide to me only information that is necessary for me to do my job at NASA. I do not need to know any rate or other business sensitive information, except the information needed on the contract.
>
> 2)   I do not need to know any marketing or business strategy information concerning targets that PAI is pursuing, unless you would like to approach ISSi with potential teaming arrangements.
>
> 3)   I would be happy to attend any business planning meetings you want me to attend as a PAI Program Manager, but please do not provide me with any sensitive PAI information. Have me at the end of the program or the beginning. Treat me as a competitor. To that end I recommend that you designate another Technical Leader as the Point of Contact for PAI on the project. . . . .

11

United States District Court

For the Northern District of California

4)      I will be reviewing the preparation of the ISSi invoices for this project.  So I recommend that I submit ISSi invoices directly to Gil Negedenk or the designated PAI controller with a copy to Bob Javinsky.

*Id.*, PAI211-024, PAI211-025.  The letter is signed by McCloy as "PAI Program Manager" and "President, ISSi."  *Id.*

McCloy also submitted various forms to PAI in connection with her position as program manager, including a "Potential Conflict of Interest Disclosure" and an "Agreement Regarding Confidentiality of PAI Executive Information," both of which were signed by McCloy.  Exhibit 88.10, PAI211-007 - PAI211-008.  The conflict of interest form is dated March 23, 2000 and lists ISSi as a "potential conflict of interest," stating as follows: "I will pursue marketing & bus[iness] development activities for ISSi."  *Id.*  The confidentiality agreement is also dated March 23, 2000.  The form is signed by McCloy and carries the following notation below the signature: "I will remain president of ISSi & continue marketing & business development activities in that capacity."  *Id.*  McCloy also signed a form, dated March 24, 2000, acknowledging that she had received and read the employee handbook and promising to "comply with the guidelines, policies, and procedures of PAI."  *Id.*, PAI211-016.  The employee handbook provides that full-time employees "must work 8 full hours per day on PAI premises" but that "exceptions may be authorized by the VP-AF."  *Id.*, PAI211-017.  It further provides that "PAI personnel working on client premises will follow the same work schedule as would be observed on PAI premises, to the extent that office access is available."  *Id.*

Subsequently, PAI and ISSi entered into a subcontract ("the Subcontract"), as had been envisioned in the Teaming Agreement.  *See* Exhibit 657.  The Subcontract identifies  McCloy as "Key Personnel" and requires that ISSi give PAI advance notice "prior to diverting" McCloy to any other projects.  *Id.*, PAI045-011 (Section 3.9).  The Subcontract does not address the specific terms of McCloy's employment with PAI as a program manager on the OSIHMES contract.

At trial, Dr. Phung's testimony was inconsistent, and often unclear, as to what McCloy or ISSi's David Dobson had represented to him regarding whether McCloy would give up her position as president of ISSi when she became a program manager of PAI.  At one point, Dr. Phung testified that he construed Dobson's letter of June 24, 1999 (see above) as a promise on the part of ISSi that

United States District Court
For the Northern District of California

1  McCloy would resign as president of ISSi if she became a PAI program manager on the OSIHMES

2  project.  *See* Trial Transcript at 414.  At another point, Dr. Phung testified that Dr. Dobson and

3  McCloy had "expressly" told him that McCloy would not be president of ISSi if she took the

4  program manager position with PAI.  Trial Transcript at 419.  At yet another point, Dr. Phung

5  testified that during his negotiations with ISSi over McCloy's future position, "I did not say

6  anything about resign[ing], that's her business and her decision, but I say that you shall not be

7  president of ISSi on this project, you shall be the employee of PAI working full-time as a program

8  manager."  Trial Transcript at 415.   In response to a request for clarification as to this testimony, Dr.

9  Phung testified as follows:

10        Sir, at the time I really did not know much about ISSi, that's newly formed company in
          March 1999. She could represent herself as anything, I trusted her because I believed in her.
11        I needed somebody who knows NASA at AMES and for her and her alone I seek 20 percent
          of the prospective program there is worth $5 million, her part of that was a $5 million.  As a
12        matter of fact, I really fully expected that she can arrange anything she like in her two-person
          company, but the agreement with both Dr. Dobson and Ms. McCloy she got to be employee
13        of PAI and program manager of this contract working full-time.

14  Trial Transcript at 415-416.  Dr. Phung went on to testify that if he had known that McCloy did not

15  intend to resign as president of ISSi when she became a PAI program manager, he would not have

16  hired her for that position.  Trial Transcript at 416.

17        With respect to  McCloy's letter in response to Dr. Phung's offer of employment – in which

18  McCloy expressly stated that she intended to remain president of ISSi and to bill four 10-hour days a

19  week –  Dr. Phung testified that he did not see that letter, or the accompanying paperwork, until

20  "way later," when he questioned the hours  McCloy was working on the OSIHMES Contract.  Trial

21  Transcript at 442.  According to Dr. Phung, it was only at that point that he became aware of

22  McCloy's intentions.  Trial Transcript at 435.  Dr. Phung testified that  McCloy's letter, as well as

23  the Conflict of Interest form were a "complete surprise" to him and that McCloy had "snuck" new

24  terms into the agreement by sending them to PAI's human resources department.  Trial Transcript at

25  441, 448.  Dr. Phung conceded that McCloy's hours, when she worked as a PAI program manager,

26  were consistent with the hours described in her acceptance letter.  Trial Transcript at 441; *see also*

27  Exhibit 4.2 (time sheets).

28        On April 3, 2000, Dr. Phung distributed a memorandum to the "PAI Team Employees"

1   working on the OSIHMES contract entitled "Welcome Onboard and Big Picture Information."

2   Exhibit 111.  In it, he stated, "Ms. Ceil McCloy, the PM of the contract, is a PAI employee.  It is

3   understood that she is also the President of ISSi.  We have worked out a plan for conflict of interest

4   avoidance."  *Id*.

5          The Court finds that the documentary evidence discussed above clearly and consistently

6   reflects that Defendant McCloy communicated to PAI her intent to remain as president of ISSi while

7   working as a PAI program manager *and* her intent to work four 10-hour days a week on the project

8   (with some of this time devoted to her commute).  In light of this evidence, Dr. Phung's testimony

9   regarding his understanding of the arrangement was not enough to submit the breach of fiduciary

10  duty claim to the jury.  *See Filipovich v. K & R Express Systems, Inc.*, 391 F.3d 859, 865-66 (7th Cir.

11  2004).  Of particular significance is the fact that Dr. Phung conceded at trial that McCloy's

12  acceptance letter stating her intentions was received by PAI – even if he personally was not aware of

13  it – and also that McCloy's hours were consistent with the terms of the acceptance letter.  As

14  McCloy owed a fiduciary duty to PAI, rather than Dr. Phung personally, his lack of awareness of the

15  terms of McCloy's acceptance do not provide a basis for establishing a breach of fiduciary duty by

16  McCloy.

17          In any event, even if McCloy *did* represent to Dr. Phung prior to her employment with PAI

18  that she would resign from her position with ISSi and work five 8-hour days, these representations

19  would not be sufficient to give rise to specific fiduciary duties in her *subsequent* employment as a

20  PAI officer.  The terms of that employment relationship were set forth in the parties' documentation

21  regarding the contract.  That documentation, including McCloy's acceptance letter, clearly set forth

22  the terms of her acceptance and those terms directly contradicted the alleged pre-contract

23  representations.  While Defendants' conduct might have given rise to a claim for fraud (a claim the

24  jury rejected), it cannot create an employment relationship that includes duties expressly rejected by

25  one of the contracting parties.

26          Nor was the employee handbook signed by McCloy sufficient to give rise to a fiduciary duty

27  on the part of McCloy to work five 8-hour days a week on site, rather than the schedule set forth in

28  McCloy's acceptance letter.  The language contained in an employee handbook that is given to an

1   employee "must be taken into account, along with all the other pertinent evidence, in ascertaining

2   the terms on which a worker was employed."  *Guz v. Bechtel National, Inc.*, 24 Cal. App. 4th 317,

3   340 (2000).  The more "clear, prominent, complete, consistent, and all-encompassing" the language

4   in the handbook, the "greater the likelihood that workers could not form any reasonable contrary

5   understanding" of the terms of employment.  *Id*. at 340 n. 11.  Here, however, the provision in the

6   employee handbook allowed for deviation from the schedule set forth in the handbook with

7   authorization.   PAI's offer of employment did not specifically require that McCloy work 8 hours per

8   day on site.  Moreover, because the Court concludes that the terms contained in McCloy's

9   acceptance letter became part of the contract, as discussed further below, McCloy's employment

10  contract specifically authorized her to deviate from the 8 hour/day schedule ordinarily required of

11  PAI employees.  Therefore, the employee handbook was not sufficient to create a fact question for

12  the jury regarding McCloy's alleged breach of fiduciary duty.

### ii.      Evidence that McCloy Favored ISSi Employees Over PAI Employees

15          PAI asserts that JMOL should be denied on the Breach of Fiduciary Duty Claim based on

16  testimony that McCloy favored ISSi employees over PAI employees.   The only evidence of such

17  favoritism that Plaintiff has identified is testimony by PAI employee Joe Zimmerman that he had

18  been told by other PAI employees that McCloy sometimes took ISSi employees out to lunch but not

19  PAI employees.  *See* Trial Transcript at 587 (citing Zimmerman deposition at 134).  Even assuming

20  that McCloy did take ISSi employees out to lunch, Plaintiff cites to no evidence that such conduct

21  resulted in any damages to PAI.  Nor does it cite any case authority suggesting that such conduct

22  could rise to the level of a breach of fiduciary duty.  Therefore, the Court concludes that this

23  evidence is insufficient, as a matter of law, to support the jury's verdict on the Breach of Fiduciary

24  Duty Claim.

### iii.     Evidence that McCloy Failed to Perform Work Expected by the Client

27          Plaintiff asserts that the jury's finding of breach of fiduciary duty by McCloy is supported by

28  evidence that McCloy performed her job as program manager in an inadequate manner.  Much of the

1  testimony relates to McCloy's failure to perform as much work as she would have had she worked

2  the hours that PAI asserts McCloy committed to work.  *See, e.g.*, Trial Transcript at 642-643

3  (testimony of Thu Le-Doan).  For the reasons discussed above, this evidence does not support a

4  finding of breach of fiduciary duty.  Plaintiff also cites to testimony by Dr. Phung that Ms. McCloy:

5  1) exceeded a cost ceiling once in a relationship with an unidentified subcontractor; 2) "allow[ed]

6  people to provide reports to the customer without checking them; 3) brought people "on board" who

7  were "not well trained"; and 4) was responsible for receiving a poor grade for PAI on its training

8  program.  Trial Transcript at 250.  Plaintiff does not point to any evidence in the record that offers

9  any basis for these conclusions.  In any event, there is no evidence that any of them resulted in

10  damage to PAI.  Therefore, this evidence is insufficient to support the jury's verdict on the Breach of

11  Fiduciary Duty Claim.

12              **iv.      Evidence that McCloy Solicited PAI Employees for ISSi**

13          Plaintiff asserts that the jury's finding of breach of fiduciary duty is supported by evidence

14  that McCloy solicited PAI employees to work for ISSi.  *See, e.g.,* Trial Transcript at 295-298; 683-

15  685; 703-704.  All of the evidence cited by Plaintiff, however, pertains to conduct that occurred in

16  2004, after McCloy's employment with PAI had terminated.  McCloy was terminated as a PAI

17  program manager effective March 2002.  Jury Instruction No. 22 (Stipulated Facts).  Because

18  McCloy's fiduciary duty to PAI had ended by this time, this conduct does not support Plaintiff's

19  Breach of Fiduciary Duty Claim.

20

21              **v.      Evidence that McCloy Worked to Steer Business Away
                           from PAI to ISSi**

22          Plaintiff asserts that the jury's finding of breach of fiduciary duty by McCloy is supported by

23  evidence that McCloy diverted business from PAI to ISSi.  Plaintiff cites to Dr. Phung's testimony

24  that McCloy marketed for ISSi but not for PAI.  *See* Trial Transcript at 249.  The only evidence that

25  ISSi ever obtained business that PAI sought, however, related to the 2005 ES contract.  That

26  evidence does not support Plaintiff's Breach of Fiduciary Duty Claim because it resulted from

27  conduct that occurred *after* McCloy was no longer employed by PAI.  Other than the ES Contract,

28  there is no evidence that any of McCloy's marketing efforts for ISSi ever damaged PAI.  Therefore,

United States District Court

For the Northern District of California

1    the evidence is insufficient to support the jury's verdict.

2                              **vi.      Conclusion**

3          Having carefully reviewed all of the evidence that was presented to the jury, the Court

4    concludes that it was insufficient, as a matter of law, for a jury to conclude that Defendant McCloy

5    breached her fiduciary duty to PAI.   Defendant McCloy is entitled to JMOL in her favor on this

6    claim.  In the alternative, if the Court of Appeals vacates or reverses this Court with respect to the

7    Breach of Fiduciary Claim, a new trial should be granted on that claim based on the Court's

8    conclusion that the verdict is contrary to the clear weight of the evidence cited above.   *See* Fed. R.

9    Civ. P. 50(c).

10                 **2.      Breach of Employment Contract Claim (Defendant McCloy)**

11                      **a.      Background**

12         Defendants assert that no reasonable jury could have found that McCloy breached her

13   employment contract based on the evidence presented at trial.  In particular, Defendants argue that

14   Plaintiff's theory that McCloy breached her employment contract by refusing to resign from her

15   position with ISSi and to commit to a five-day, 40-hour work week fails, as a matter of law, because

16   the evidence shows that Dr. Phung did not specify in his offer letter (see above) what hours McCloy

17   would work and PAI knew and accepted McCloy's decision to remain as ISSi president and work a

18   4-day week.

19         Plaintiff does not dispute that Dr. Phung's letter to McCloy was an "offer," but argues

20   instead that the letter incorporates the terms of employment agreed to by the parties in the course of

21   the negotiations between McCloy and ISSi, on one hand,  and PAI, on the other.  In support of this

22   position, Plaintiff points to the words "Per our agreement" at the beginning of Dr. Phung's letter to

23   McCloy.  Looking beyond the letter to the other evidence reflecting the relationship between PAI

24   and ISSi (discussed above), Plaintiff argues that it becomes clear that the employment agreement

25   required McCloy to resign from ISSi and work a five-day, 40-hour week when she became PAI's

26   program manager on the OSIHMES Contract.

27

28

### b.     Analysis

It is black-letter law that in order for a contract to be formed, "[a]n acceptance must be absolute and unqualified."  *See* Cal. Civ. Code § 1585.  "A qualified acceptance is a new proposal." *Id*.  Further, an offer may be accepted by "acceptance of the consideration offered with the proposal."  Cal. Civ. Code § 1584; *see also* Cal. Civ. Code § 1589 ("A voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising from it, so far as the facts are known, or ought to be known, to the person accepting").

Here, it is undisputed that Dr. Phung's letter was an "offer."  It is also undisputed that McCloy, in her letter of acceptance, included specific conditions that were not contained in the offer letter, namely, that she would remain as president of ISSi and that she would work four ten-hour days a week, which would include two hours a day of commute time.  It is also undisputed that PAI's human resources department received this letter and that it permitted McCloy to commence work without notifying her that her proposal was unacceptable.  Accordingly, the qualifications contained in McCloy's letter accepting PAI's offer of employment became part of the employment contract.  Further, as discussed above, PAI's president conceded that McCloy worked the hours she said she would.  Because the conduct on which Plaintiff based its claim for breach of employment contract was consistent with the terms of the employment contract, Defendant McCloy is entitled to JMOL as to this claim.

Alternatively, as discussed above, no reasonable jury could conclude that McCloy agreed to resign as president of ISSi, or work five 8-hour days on site, when she accepted the position as a PAI program manager.  At the very least, therefore, these requirements were not part of her employment contract with PAI.  McCloy is entitled to JMOL on PAI's Breach of Employment Contract Claim on this basis as well.  If the Court of Appeals vacates or reverses this Court's holding on the Breach of Employment Contract Claim, a new trial should be granted on this claim because the verdict is against the clear weight of the evidence.  *See* Fed. R. Civ. P. 50(c).

### 3.     Breach of Confidentiality Agreements Claim (Defendant McCloy)

#### a.     Background

Defendant McCloy signed three confidentiality agreements ("the Confidentiality

**United States District Court**
For the Northern District of California

Agreements") with PAI during the period in which she worked as a program manger for PAI.  *See*
Exhibits 88.6 - 88.8.  Under the Confidentiality Agreements, McCloy was prohibited from disclosing
PAI confidential information to third parties and promised that she would "not take any proprietary
information or materials with [her] when [she] terminate[d] her employment with PAI."  Exhibit
88.6 - 88.8.    At trial, Plaintiff asserted that McCloy breached these agreements, pointing to the
following evidence: 1) ISSi's 2004 ES proposal contained pages that are similar to "view graphs"
from PAI's 1999 OSIHMES proposal, suggesting McCloy recycled pages from PAI's confidential
proposal to win the ES contract, *see* Exhibit 10 (1999 PAI OSIHMES proposal), Exhibit 610 (ISSi
2004 ES proposal) & Exhibit 801 (view graphs given to McCloy in 1999); and 2) solicitation letters
to PAI employees that were sent by ISSi after McCloy left PAI, raising an inference that McCloy
took with her PAI's proprietary list of its employees, which had been provided to her as a PAI
program manager.

Defendants assert that this evidence is insufficient to support the jury's verdict on the Breach
of Confidentiality Agreements Claim.  With respect to the pages from PAI's 1999 OSIHMES
proposal that were allegedly recycled in ISSi's 2004 ES Proposal, Defendants argue that there is no
evidence that these pages were even confidential, noting that the pages in the record, *see* Exhibit
801, did not carry any stamp indicating that they were confidential or proprietary.  In any event,
Defendants argue, Dr. Phung testified that he gave the pages to McCloy *before* she signed the
Confidentiality Agreements and therefore, their use was not a breach of the Confidentiality
Agreements.  With respect to the PAI employee information, Defendants cite to testimony by Dr.
Phung that a lot of files were missing after McCloy left but that he could not say she had actually
taken the files.  *See* Trial Transcript at 471.  Based on this testimony, PAI argues that PAI's claim is
speculative to the extent it is based on McCloy's alleged failure to return the employee lists.

### b.    Analysis

In order to establish that McCloy is liable to PAI for breaching the confidentiality
agreements, Plaintiff was required to prove, by a preponderance of the evidence, the following
elements: 1) Plaintiff and Defendant McCloy entered into a contract to maintain information
confidential; 2) Plaintiff did all, or substantially all, of the significant things that the contract

United States District Court

For the Northern District of California

required it to do or was excused from doing those things; 3) All conditions required by the contract for McCloy's performance had occurred; 4) McCloy failed to keep Plaintiff's confidential information confidential and disclosed such information to unauthorized third parties; 5) Due to McCloy's breach, Plaintiff was harmed.  The Court concludes that the evidence presented at trial was sufficient to support the jury's verdict.

### i.   The View Graphs

At trial, Dr. Phung testified that in 1999, when PAI and ISSi were working on the OSIHMES proposal under the Teaming Agreement, he provided McCloy with "view graphs" from PAI's OSIHMES Proposal so that she could make an oral presentation as part of PAI's presentation to NASA.  Trial Transcript at 393; Exhibit 801 (view graphs given to McCloy); *see also* Exhibit 10 (1999 OSIHMES Proposal, including view graphs).  Dr. Phung also testified that the OSIHMES Proposal was "extremely confidential."  Trial Transcript at 168.  Finally, ISSi's ES proposal includes pages that closely resemble the view graphs from the OSIHMES proposal.  *See* Exhibit 610 at 59, 63, 76.  From this evidence, the jury could reasonably have concluded that McCloy retained PAI proprietary information after her termination and in doing so violated the Confidentiality Agreements.   The Court rejects Defendants' assertion that McCloy could not have violated the Confidentiality Agreements because she obtained this information prior to signing those agreements. The terms of the agreements required McCloy to return all PAI proprietary materials upon termination, without limitation.   Defendants have cited no case authority that suggests that a confidentiality agreement may not operate retroactively to cover confidential materials provided to a party before the agreement was signed.

### ii.   The PAI Employee Information

Plaintiff also points to evidence that McCloy breached the Confidentiality Agreements by retaining PAI's proprietary list of employees.  In particular, at trial, evidence was presented that while a PAI program manager, McCloy was provided with a "manager's desk book" that contained a complete list of PAI employees, including home addresses and telephone numbers.  Trial Transcript at 252-254; Exhibit 195.  The pages containing the employee information carried the following designation at the bottom of each page: "This is a proprietary document of PAI Corporation.

United States District Court

For the Northern District of California

1    Circulation outside of PAI is prohibited."  Exhibit 195 at PAI263-015 to PAI263- 050.  In addition,

2    Plaintiff presented evidence that in 2004, ISSi sent letters individually addressed to 27 PAI

3    employees soliciting their resumes for consideration on the ES proposal.  Exhibits 49, 659.  Further,

4    PAI pointed to evidence from which the jury could have concluded that ISSi's contacts with PAI's

5    employees helped it to win the ES contract.  In particular, in the ES Proposal, ISSi touted the fact

6    that it had "contacted every staff member" and would be able to offer a 95% retention rate with

7    respect to incumbent employees.  Exhibit 610 at 63, 70; *see also* Trial Transcript at 773 (testimony

8    by Expert Witness Brown that 95% incumbent capture rate was a factor that would be evaluated by

9    NASA in deciding to award contract).   Based on this evidence, a jury could reasonably find that

10   Defendant McCloy violated the terms of the Confidentiality Agreements by retaining the manager's

11   desk book with PAI's proprietary information after her termination.[3]

12       For the reasons stated above, the Court rejects Defendants' request for JMOL on the Breach

13   of Confidentiality Agreements Claim.

14

15           **4.**      **Intentional Interference With Prospective Economic Advantage Claim (Defendants McCloy and ISSi)**

16           **a.**      **Background**

17       At trial, Plaintiff asserted that Defendants McCloy and ISSi intentionally interfered with its

18   prospective economic advantage by improperly using parts of PAI's confidential OSIHMES

19   proposal, and by soliciting PAI employees, in order to win the ES contract for ISSi.  The jury found

20   in favor of Plaintiff on the Intentional Interference Claim as to both Defendants.  In the JMOL

21   Motion, Defendants assert that the jury's verdict should be set aside because Plaintiff failed to

22   demonstrate that Defendants engaged in independently wrongful conduct.  In particular, Defendants

23   point to the fact that the jury found in favor of Defendants on Plaintiff's claims for  misappropriation

24   of trade secrets and fraud and argue that to the extent they are entitled to JMOL on the Breach of

25

26         [3]The Court rejects Defendants' assertion that the jury's finding that McCloy breached her confidentiality agreements with PAI was "directly at odds" with its finding that McCloy and ISSi did

27   not steal or disclose any of PAI's trade secrets. JMOL Motion at 10. The jury could reasonably have concluded that McCloy breached the confidentiality agreements by using or disclosing information that

28   was confidential but did not rise to the level of trade secrets. *See* Jury Instruction 54 (defining "trade secret").

**United States District Court**
For the Northern District of California

1 Fiduciary Duty Claim against McCloy – which is the only remaining tort alleged – the Intentional

2 Interference Claim also fails.  Defendants also argue that JMOL is warranted on the Intentional

3 Interference Claim because Plaintiff did not establish causation as to the claim.

4    Plaintiff asserts that it has established independently wrongful conduct on the basis of the

5 breach of fiduciary duty by McCloy.  It further asserts that the evidence was sufficient to support the

6 jury's verdict with respect to causation.

7                              **b.     Analysis**

8    As part of its claim for intentional interference with prospective economic advantage,

9 Plaintiff was required to prove, by a preponderance of the evidence that Defendants engaged in an

10 intentional action that is "wrongful by some measure beyond the fact of the interference itself."

11 *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal.4th 376, 385 (1995).   To satisfy this

12 requirement where a competitor asserts its conduct was protected by the competition privilege, as is

13 the case here, the plaintiff must show "the competitor's conduct violated a statute or constituted a

14 tort such as fraud or unfair competition." *San Francisco Design Center Associates v. Portman*

15 *Companies*, 41 Cal. App.4th 29, 42-43 (1995).  Where, however, the conduct at issue is, in essence,

16 a breach of contract, California courts have held that such conduct may not provide the basis for tort

17 liability on a claim for interference with prospective economic advantage.  *See JRS Products, Inc. v.*

18 *Matsushita Elec. Corp. of America*, 115 Cal. App.4th 168, 181-183 (2004).

19    In *JRS Products*, the plaintiff alleged that the defendant had wrongfully terminated the

20 dealership agreement between them.  *Id*. at 172.  Based on this conduct, the plaintiff asserted

21 numerous claims, including breach of contract and intentional interference with prospective

22 economic advantage.  *Id*.  The jury found in favor of plaintiff on the Intentional Interference Claim

23 and the plaintiff appealed, arguing that a party to a contract cannot recover damages in tort based on

24 a breach of contract.  *Id*. at 179.  The court of appeal agreed.  *Id*.  The court reasoned that because

25 the interference claim was based on the defendant's alleged wrongful termination of the franchise

26 contract, the claim sounded in contract rather than tort and therefore, that the plaintiff could not

27 transmute the claim to one that gave rise to tort liability.  *Id*. at 182.   The court expressly rejected

28 the plaintiff's argument that the defendant engaged in unfair competition when it terminated the

United States District Court

For the Northern District of California

1   franchise agreement with the plaintiff, thereby establishing independently wrongful conduct.  *Id*. at

2   182.  The court stated as follows:

> Although superficially seductive, if accepted, the argument would convert any wrongful termination of a franchise agreement into a tort claim. JRS cites no authority to support its novel proposition that the breach of a franchise agreement exposes a franchisor to tort liability based on its "independent duty" to adhere to its "social obligation not to violate franchise laws or engage in unfair competition." Although JRS would have us expand tort liability to allow for a tortious breach of contract as long as the breach violates a statute, it fails to consider the dangers implicit in such a radical departure from well-established limits to commercial recovery. "Because ours is a culture firmly wedded to the social rewards of commercial contests, the law usually takes care to draw lines of legal liability in a way that maximizes areas of competition free of legal penalties."( *Della Penna*, supra, 11 Cal.4th at p. 392, 45 Cal.Rptr.2d 436, 902 P.2d 740.)

*Id*.

In this district, a federal district court recently followed *JRS Products* in *First Advantage Background Services Corp. v. Private Eyes, Inc.*, 2007 WL 2572191 (N.D.Cal., September 5, 2007). In that case, the court held that an alleged breach of a confidentiality and non-solicitation agreement by the Defendant to solicit business from one of the plaintiff's customers was not sufficient to state a claim for intentional interference with prospective economic relations.  *Id*. at *2.

Here, the jury found for Defendants as to all of Plaintiff's tort claims except breach of fiduciary duty and the Court has found that Defendants are entitled to JMOL on that claim.  Further, the remaining claims, for breach of the Confidentiality Agreements, Breach of the Subcontract and Unfair Competition, turn on the theory that McCloy breached her Confidentiality Agreements and ISSi breached the non-solicitation clause in its Subcontract with PAI, thereby gaining an unfair advantage over PAI that allowed it to win the ES contract.  These claims are, in essence, contractual in nature.  Thus, to the extent the Intentional Interference Claim is based on the same conduct, it also is premised on a breach of contractual obligations, rather than on a tort.  Therefore, the Court concludes that Defendants are entitled to JMOL on the Intentional Interference Claim because there is no evidence that Defendants engaged in independently wrongful conduct sufficient to give rise to tort liability.

In the alternative, if the Court of Appeals reverses this Court's grant of JMOL with respect to the Intentional Interference Claim, Defendants are entitled to a new trial on that claim to address the causation of damages element.  Fed. R. Civ. P. 50(c).  As discussed below, the Court concludes that

United States District Court

For the Northern District of California

1    the clear weight of the evidence at trial supported Defendants' position that PAI's alleged damages

2    were not caused by Defendants' conduct.

3                    **5.        Whether a New Trial is Necessary on Damages**

4            Defendants assert a new trial on damages is required because the verdict form did not

5    allocate damages between the two Defendants and did not link damages to specific claims, resulting

6    in the improper imposition of liability on Defendant McCloy for ISSi's conduct.  Plaintiff argues

7    that Defendants waived these objections when they agreed to the verdict form proposed by the Court

8    at trial.  Regardless of whether or not Defendants waived their objection, the Court concludes that a

9    new trial to address the question of damages on all of PAI's remaining  claims is required.

10           At trial, Plaintiff presented evidence of several different types of damages.  Not all of the

11   damages that Plaintiff sought to establish flowed from all of the claims.  For example, in addition to

12   the evidence of lost profits that allegedly resulted from PAI's failure to win the ES Contract,

13   Plaintiff presented testimony by Dr. Phung relating to the cost of replacement labor that arose due to

14   McCloy's alleged failure to work a 40 hours a week.  Under Plaintiff's theory of the case, the latter

15   was a harm that resulted from McCloy's breach of her fiduciary duty to PAI and her employment

16   contract but which was unrelated to the claims for Breach of Confidentiality Agreements, Breach of

17   the Subcontract and Unfair Competition.  It is impossible to determine how the jury arrived it its

18   damages figure or which items of damages their award included.  Thus, to the extent that the Court

19   has concluded that Defendants are entitled to JMOL on some of their claims, a new trial is required

20   to allow the jury to determine damages on the remaining claims.

21           A new trial on damages is also appropriate because, as Defendants argued in their JMOL

22   Motion, the clear weight of the evidence at trial supported the conclusion that Defendants' conduct

23   was not a substantial factor in causing PAI to lose the ES contract, which was the largest element of

24   PAI's claimed damages.  In the Source Selection Statement, NASA stated that PAI's "proposed

25   program manager did not meet the experience requirements," which it considered a "significant

26   weakness" in connection with PAI's "Management Approach."  Exhibit 632 at 7.  According to

27   NASA, "[n]o significant strengths were identified for this subfactor to offset the significant

28   weakness."  *Id*. at 12.  PAI's president acknowledged the seriousness of this deficiency in  a

United States District Court

For the Northern District of California

1    memorandum to his employees dated February 14, 2005, stating that "[t]he most serious reason for

2    our loss was the verdict that our proposed PM, Bill Vermeere, was 'not qualified.'" Exhibit 696.

3    Similarly, in his deposition, Dr. Phung testified that the deduction of over 100 points from PAI's

4    score in the ES competition was "fatal" to PAI's candidacy for the contract.  Trial Transcript at 516.

5    Defendants' expert, Dennis Brown, a former senior procurement officer for NASA Ames, also

6    testified that the reason PAI was not awarded the contract was that it designated a program manager

7    who was found to be unqualified.  Trial Transcript at 748.

8         It is true that NASA evaluated the ES proposals based on a number of factors and therefore,

9    theoretically, at least, PAI might have been able to overcome its weakness as to the Management

10   Approach factor to win the ES contract by scoring high in other categories.  Further, the jury was not

11   required to accept the opinion of Defendant's expert, Dennis Brown, as to the reason PAI lost the ES

12   contract.  Indeed,  Brown conceded that ISSi's staffing plan, including its assertion that it would

13   have a 95% incumbent retention rate, would have been a factor that NASA evaluated in awarding

14   the ES contract.  Trial Transcript at 773.  Brown also testified that no single factor is determinative

15   in NASA's selection.  Trial Transcript at 781.   Nonetheless, while there is some evidence that ISSi

16   may have strengthened its ES proposal by using PAI's view-graphs and by representing that it would

17   have a 95% staff retention rate, the evidence is scant that these factors in fact played any significant

18   part in determining the outcome of the ES competition.   The Court concludes that the evidence

19   favored Defendants so clearly on this question that Defendants are entitled to a new trial on

20   damages.

21         **6.      Whether a New Trial is Necessary Because the Verdict is Inconsistent**

22         Defendants argue that a new trial is required because the jury's verdict is inconsistent.  In

23   particular, Defendants argue that the jury's finding in favor of PAI on the Intentional Interference

24   and Unfair Competition Claims is directly contradicted by the jury's finding that Defendants did not

25   misappropriate PAI's trade secrets or commit fraud.  Plaintiff counters that the jury's verdict is

26   consistent because the jury found a breach of fiduciary duty by McCloy, which satisfies the

27   wrongful conduct requirements of both the Unfair Competition and Intentional Interference Claims.

28

United States District Court

For the Northern District of California

Because the Court concludes that Defendants are entitled to JMOL on the Intentional Interference Claim, the Court need only address the question of whether the jury's verdict on the Unfair Competition Claim is inconsistent with its finding that Defendants did not misappropriate PAI's trade secrets or commit fraud. The Court concludes that it is not. The jury was instructed that it could find in favor of PAI on its Unfair Competition Claim on any of a number of grounds, including on the basis of Defendants' "misappropriation and disclosure of confidential and proprietary Plaintiff information to compete against Plaintiff." Jury Instruction No. 69. This instruction is consistent with California law, under which "[a] former employee's use of confidential information obtained from his former employer to compete with his old employer and to solicit the business of his former employer's customers, is regarded as unfair competition." *Rigging International Maintenance Co. v. Gwin*, 128 Cal. App. 3d 594, 606 (*citing Greenly v. Cooper*, 77 Cal.App.3d 382, 391-392 (1978); 7 Witkin, Summary of Cal. Law (8th ed. 1974) Equity, § 87, p. 5309.) Because the jury could reasonably have found unfair competition on this basis, the Court rejects Defendants' assertion that they are entitled to a new trial based on inconsistency in the jury's verdict.

### 7. Whether a New Trial is Necessary Because the Weight of the Evidence Shows that Defendants Were Entitled to Damages on the Counterclaim

Defendants assert that a new trial should be granted on ISSi's counterclaim for breach of the subcontract because the clear weight of the evidence established that ISSi was entitled to damages on the counterclaim. In particular, Defendants point to evidence that it claims is unrebutted of: 1) $8,531 in unpaid invoices (Trial Transcript at 1001-1003); 2) $5,635 in unpaid award fee for Period 10 of the OSIHMES contract (Trial Transcript at 1003-1004, 1028-1029); 3) $254,000 in unreimbursed costs by ISSi on the cost reimbursement OSIHMES contract (Trial Transcript at 1004-1005, 10029); and 4) $32,000 in reduced fee awards for Periods 1 through 9 of the OSIHMES contract (Trial Transcript at 1005-1007, 1040-1042).[4] The Court rejects Defendants' assertion.

---

[4]In their Reply brief, Defendants concede that the jury might have accepted Plaintiff's defense that the unreimbursed costs exceeded the ceiling of the subcontract.

United States District Court
For the Northern District of California

1    In addition to finding that Defendants were not entitled damages on the counterclaim, the

2  jury found  that PAI did not breach the Subcontract in the first instance.  The jury could reasonably

3  have concluded based on the evidence presented at trial that ISSi's counterclaim failed based on its

4  failure to perform under the Subcontract.  Thus, even though Defendants may have presented strong

5  evidence establishing that PAI failed to pay certain amounts due under the Subcontract, no new trial

6  is required because the jury's verdict is supported on other grounds, namely, that Defendants failed

7  to establish all the elements required for their breach of contract counterclaim.

8  **IV.    CONCLUSION**

9    For the reasons stated above, the Motions are GRANTED in part and DENIED in part as

10  follows: JMOL is granted in favor of Defendants with respect to PAI's claims for Breach of

11  Fiduciary Duty,  Breach of Employment Agreement and Intentional Interference with Prospective

12  Economic Advantage.  In the alternative, under Rule 50(c), if the Court of Appeals reverses this

13  Court's JMOL on these claims, a new trial is required on them as set forth above.  In addition, the

14  Court GRANTS Defendants' request for a new trial on damages on all of PAI's remaining claims.

15  This new trial will include the question of what damages, if any, were caused by Defendants'

16  conduct with respect to the remaining claims.  The Motions are DENIED in all other respects.  The

17  jury's damages award is vacated.

18    The parties shall meet and confer and submit a proposed schedule for a new trial by May 15,

19  2009.  A further Cases Management Conference is set for May 29, 2009 at 1:30 p.m.

20    IT IS SO ORDERED.

21

22  Dated: April 23, 2009

23                                              JOSEPH C. SPERO
                                                United States Magistrate Judge
24

25

26

27

28

27